Davis, Judge,
delivered the opinion of the court:
Standing squarely on the record made before the Claims and Appeals Board of the Corps of Engineers (except as to the amount of recovery), the plaintiff-contractor; insists that it is entitled to equitable adjustments under the Changed Conditions and Changes articles , of its contract, as well as remission of liquidated damages assessed against it for unexcused delay in completion. The contract, made in 1951-1952 with the Corps of Engineers after open bidding, was for construction, of the intake structure and outlet diversion at the Lucky Peak Dam, near Boise, Idaho. The price was $396,610, and the work was to be finished not later than 150 calendar days after receipt of the notice to proceed (January 14, 1952). Plaintiff’s work was the third of five separate phases composing the overall project; the first two units had previously been accomplished by other contractors, and two later phases were to follow.'
Of plaintiff’s various claims connected with this contract only three are presented in this suit. Each of these three items was decided adversely to the contractor, on the merits, by the Claims and Appeals Board. Plaintiff’s position is that the Board misconstrued the contract and failed to follow the overwhelming evidence which should have compelled the Board to uphold the claims under the Changes, Changed Conditions, and Liquidated Damages provisions of the contract. Our Trial Commissioner has found the Board correct in its legal interpretations and adequately supported in its factual findings.
*259 I
The unique aspect of this case — tried and reported by the Commissioner before the decision in United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963) — is the parties’ reversal-of-roles with respect to the introduction of de novo evidence in this court. Except on the issue of damages (which the Board had not tried or decided since it ruled in favor of defendant), plaintiff offered only the administrative record and objected to the Government’s presentation of any new evidence not directed strictly to the amount of damages. Over these objections, the Government introduced much de novo evidence, some of which admittedly bore on the issue of liability. The plaintiff now argues that the Commissioner’s findings are wholly vitiated because he took account of this additional evidence. The defendant’s answer is that, although some of the Commissioner’s subsidiary findings may rest in minor part on de novo evidence, all of his major and dispositive findings are properly grounded in the administrative record. For this reason, the Government does not press us to revise all the findings to conform only to the materials before the Board (although it does not formally recede from its general position that the Board alone can take evidence).
We need not decide, in this case, whether and to what extent we can follow the course taken in Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), and later decisions[1] of considering de novo evidence on the issue of the acceptability of administrative findings made under the contract. With keen foresight, the Commissioner has made separate and distinct findings — as to each of the three claims presented by plaintiff and on all major factual issues — first, on the basis of a review of the Board record *260 alone, and, second, on tbe 'basis of the entire record in this court including the new evidence. As will appear in Part II of this opinion, we agree with these findings of the Commissioner and therefore determine that the Board’s crucial findings are sufficiently sustained by the record before it, as well as by the court record. Whatever be the correct position on de novo testimony in this case, the plaintiff cannot prevail. We therefore do not undertake the laborious task of reviewing each and every subsidiary finding to make sure that it rests, or can rest, solely on the Board record. Since our conclusions and critical findings are all supported both by the Board proceedings and by the judicial record, it is unnecessary and useless to borrow trouble by engaging in the burdensome process of combing each of the preliminary findings.[2] Cf. Hoffman v. United States, 166 Ct. Cl. 39, 49-52, 340 F. 2d 645 (1964).
We are the less hesitant to reject plaintiff’s invitation to undertake that troublesome but needless chore since plaintiff has not helped us by filing proper exceptions to the Commissioner’s findings. The court’s rules contemplate that the parties will except to each finding with which they disagree and will give appropriate record references for each exception. See former Rules 45 (c) and (e), and 46 (c), and present Rules 5T (c) and (f), and 58(c). Decisions implementing those rules have refused to take account of general exceptions which fail to give us the help of pinpointing the alleged error or of isolating the particular part of the record on *261 which the exception relies.[3] Instead of commenting on the Commissioner’s findings individually and in detail, the plaintiff has simply set forth its own extended narrative version of the facts, appending for good measure the complete findings it proposed to the Commissioner. Exceptions of this type impose too great a burden on the court to separate, for itself, the wheat from the chaff. The defendant has given us, finding by finding, a tabulation of the extent to which the Commissioner’s findings are supported (in the defendant’s eyes) by the administrative record, but the plaintiff has not provided any comparable aid. Plaintiff, therefore, has no standing to insist that each and every one of our findings on liability reflect only the evidence in the Board record.
II
A. The first claim relates to the crumbling of the hill rising over plaintiff’s work-place. Above and about the floor of the intake channel and the tunnel entrance, around which plaintiff’s job was centered, there arose a steep semi-circular slope, man-made, composed of jointed and fractured basalt. During performance this slope raveled considerably so that, from time to time, pieces of rock fell down into the working area in sufficient quantities and force to endanger the workmen below. To protect its employees plaintiff had to undertake scaling operations — in which skilled workmen suspended on the slope pry or wedge loose of potentially loose rock from the surface — much more extensively than it had contemplated. Meanwhile, the contract work had to be suspended. Claiming that the raveling anticipated by the parties was minor and that the excessively raveled condition of the slope which was encountered in performance was aii unknown and unusual physical condition, plaintiff sought an increase in cost under Article 4, Changed Conditions (finding 10), for the additional scaling, the incidental delay, and the loss of efficiency. The Claims and Appeals Board *262 denied this claim, although it did allow the costs of recuperating from sudden large rock slides which occurred on May 8, 1952.
The Board’s determination had both legal and factual components. Article 4 provided for adjustments due to “subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications * * *.” Under this clause the Board found that the raveling which occurred here was “neither a subsurface, latent physical condition nor ,one of unusual nature differing materially from that normally encountered in work of the character provided in this contract” (finding 69). We agree with the Trial Commissioner that, to the extent the Board interpreted the contract, it did so correctly, and, to the extent it fpund facts, its findings are properly supported in the record before it (as well as in the more extensive record before the court).
Baveling, as the Board found, consists of surface small rock falling down a cliff or slope by force of gravity. That this condition was expectable was clearly indicated in the contract documents which listed scaling (i.e., the accepted method of preventing raveling) as one “principal feature” of the work (finding 14) ; repeatedly told the plaintiff, without qualification, that scaling would be required (see findings 18, 19, 20, and 21); [4] and declared that “no separate or direct measurement or payment will be made for * * * scaling, since the work and cost thereof shall be considered incident to, included in, and paid for under the contract prices for concrete bid items” (finding 22). The contractor was thus explicitly warned in writing that it would have to scale in order to stave off raveling.
*263 Plaintiff’s argument that the amount of raveling it had to face was extraordinary and unusual is contradicted by the Board’s well-supported findings, which are reflected in our own findings. The considerable tendency of fractured basalt, in this geographical area, to ravel (especially in times of freezing and thawing) is shown by the experience of the prior contractor on this very project, the expectations of two other bidders for the work plaintiff undertook, the conclusions of plaintiff’s own engineering expert, and the common knowledge as to the characteristics of such rock in the Pacific Northwest. See findings 29, 31, and 69. Plaintiff’s representatives made an inadequate investigation of the site before bidding, underestimating the probable extent of raveling because they failed to make sufficient inquiry and investigation. Finding 31.[5] Plaintiff now emphasizes a statement in a Government Geologic Report (of which plaintiff was unaware until the Board proceedings) that “minor raveling can be expected to continue but should not be construed as a matter of concern” (emphasis added). As the Board points out (finding 69), however, this meant minor raveling for fractured basalt of this weathered type, after periodic scaling had been undertaken — not minor raveling if periodic scaling was omitted. Since plaintiff failed to provide periodic scaling (so the Board properly found), there is no showing that the actual raveling was other than “minor” in the sense of the Geologic Report. In any event, this one statement does not outweigh the other parts of the record on the basis of which the Board could and did find that the amount of raveling met by plaintiff was not so unusual or extraordinary as to fall within the Changed Conditions clause.
Plaintiff also charges the Board with inconsistency in finding that the sudden rock slides on May 8, 1952, were within the Changed Conditions article, while the more-or-less continuous raveling was not. There is no conflict. The Board found expressly that the slides (which it carefully *264 distinguished from raveling) were due to the defendant’s faulty design of the slope or to a hidden fault and joint system, within the slope, not reasonably discoverable by the contractor before bidding — and that scaling the surface cliffs would not forestall such major falls. On the other hand, the raveling occurred, in the Board’s view, because of the known “fractured, soft, slabby, altered and weathered” condition of the basalt, taken together with expectable weather conditions and the erosion due to alternate freezing and thawing of the cliff. These conclusions are fully supported by the administrative record.
B. Alternatively, plaintiff urges that it is entitled to damages because the defendant, which knew the true situation as to raveling, failed to disclose its information to the contractor before the bidding. No misrepresentations (oral or written) are asserted, nor any refusal to answer inquiries, but solely a failure to proffer the Government’s information bearing on raveling.[6] We find no such breach because, under this contract, there was no obligation on the Government to volunteer facts which could reasonably have been discovered through plaintiff’s own investigation and pursuit of leads given by the contract papers. The “Site Investigation and Representations” paragraph (finding 15) made the contractor responsible for satisfying itself “as to the nature and location of the work, the general and local conditions, particularly those bearing upon * * * uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground * * * and all other matters upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract.” The clause also cast the responsibility on the contractor “as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory-work done by the Government, as well as from information *265 presented by the drawings and specifications made a part pf this contract.”
Where the contract incorporates such a clause, the contractor has no claim if the missing information would have been obtained through the inquiries contemplated by the article. Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 365-68 (1963), 312 F. 2d 408, 413-1-5.[7]
Plaintiff fails this test. We have pointed out that it made an inadequate inspection of the site, failed to make inquiries of the defendant’s personnel or of the prior contractor then working in the area, and failed in general to make a proper evaluation of the visible and expectable conditions. If these steps had been taken, plaintiff would have had substantially all the necessary information. In addition, plaintiff did not examine the available logs of drill holes in the vicinity of the slope or follow up a note that “fault and joint systems known to exist in inlet area are not represented on this drawing”; both of these were mentioned in one of the contract drawings (finding 24). Plaintiff’s own expert before the Board testified that a careful and prudent bidder would not have relied upon visual observation alone but would have pursued the drawing note as to “fault and joint systems.” If this had been done, plaintiff would have obtained the Government’s Geologic Eeport, discussed above, referring to periodic scaling and “minor” raveling, and containing much information on the geologic structure of the slopes.[8] A “contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid.” The contractor cannot “rest content with the materials physically furnished to him; he must also refer to other materials which are available and about which he is told by the contract documents.” Flippin Materials Co. v. United States, supra, p. 367, 312 F. 2d at 414 (footnote omitted).
*266 O. The second of plaintiff’s claims is that the Board erroneously failed to extend the contract completion date for some 58 days, so as to remit liquidated damages for half of that period.[9] We find no reason to overturn the Board’s determination or to remit the liquidated damages ultimately assessed. The administrative findings of fact are adequately supported by the administrative record on the claimed extensions for (a) unduly severe weather and (b) raveling and scaling. With respect to the latter, the Board found explicitly that much of the alleged delay was concurrent with weather delays already covered by extensions of time and it found implicitly that the raveling delay was not beyond the contractor’s control (within the meaning of the Delays-Damages clause). We also reject plaintiff’s unique argument that the contract completion date (150 days from receipt of notice to proceed) should not be calculated from January 14, 1952, when plaintiff received the notice, but from February 2, 1952, when the formal written contract was finally delivered. The parties were bound from the time of the award on December 21, 1951, and plaintiff expressly agreed to commence work within five days after receiving written notice to proceed. This notice was not unreasonably delayed and plaintiff accepted it as proper. The receipt of the formal contract was irrelevant to the agreed period for performance. Finally, we accept — for the reasons given in Part I, supra — the Trial Commissioner’s finding (and alternative conclusion) that plaintiff’s own fault caused inexcusable delays for at least the 29 days for which liquidated damages were assessed. Finding 67.
D. The last claim is that defendant ordered plaintiff to accelerate the job and complete the work within the original 150 days without time-extensions. This facet of the case is likewise meritless. As already indicated, a substantial extension of time was in fact allowed and the Board properly denied the requests for, further extensions. It is admitted *267 that the plaintiff did not complete the work within the extended time. Accordingly, the Board held correctly that there was no actual acceleration in performance by plaintiff. Nor was there any requirement by the Government that plaintiff complete the work in less time than allowed by the contract, as properly extended. The Government did urge plaintiff to complete the work within proper time, but that it had a full right to do.
The plaintiff is not entitled to recover and the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a corporation of the State of Washington, engaged in contract construction work, with principal office at Wenatchee, Washington, was owned, controlled, and managed by four individuals, Messrs. Hunt, Willett, Leonard, and Reynolds, who were also its corporate officers.
2. On October 23, 1951, the Corps of Engineers, Department of the Army, issued from its Walla Walla, Washington, District Office, its Invitation for Bids No. CIVENG-45-164-52-35, and on November 7, 1951, Addendum No. 1 thereto, calling for sealed bids to be submitted at such office to be opened at 2:00 p.m., November 20,1951, for furnishing all plant, labor, and materials and equipment and performing all work for construction of intake structure and outlet diversion, Lucky Peak Dam, near Boise, Ada County, Idaho, in strict accordance with Specification No. and Schedule No. CIVENG-45-164 — 52-35 and the drawings listed in paragraph SC-5 of such specifications.
This invitation as amended stated that the bidder awarded tiie contract would be required to execute the Department of the Army contract form for construction (DA AGO Form R-5701) a copy of which was stated to be available in the Walla Walla District Office.
Bid bond on U.S. Standard Form No. 24 was required with each bid.
*268 The right was reserved, for the Government to revise or-amend the specifications and/or drawings prior to the date set for opening of bids, such revisions or amendments to-be announced by issuance of an addendum or addenda to' the invitation, in which event the date for opening of bids could be postponed by addendum by such number of days as in the opinion of the District Engineer would enable) bidders to revise their bids.
Addendum No. 2, dated November 16, 1951, eliminated three items from the unit price schedule of the proposed contract performance, added certain minimum wage rates,, revised some paragraphs of the specifications, and extended, the bid opening date to 2:15 p.m., November 29,1951.
Addendum No. 3, dated November 21, 1951, revised the estimated quantities on two of the eight bid items, made-some amendments to the specifications, but continued the-bid opening time as last set.
3. On November 29, 1951, just before the bid opening,, plaintiff submitted its bid at the Walla Walla District Office on a Government bid form, which was required by the invitation and attached thereto. This bid form in addition to-language pertinent to submission of a responsive bid, contained the following agreements by plaintiff:
* * * upon receipt of written notice of an award of" the contract within thirty days after the date of opening-of the bids, that he will execute DA AGO Form B.-5701,. in accordance with this bid as accepted, and if the consideration of the contract will exceed $2,000 in amount, will furnish to the Government a performance bond, on U.S. Standard Form No. 25 or U.S. Standard Form, No. 25-B -and a payment -bond on U.S. Standard Form No. 25-A.or U.S. Standard Form No. 25-0 with good and sufficient surety or sureties, as required by these specifications, at the time that the contract is executed.
* * * ;|j
* * * if awarded the contract he will commence the-, work within 5 calendar days after receipt of written notice to proceed, provide the plant and equipment as. set forth m attached schedule, ENG Form 1619, and. that he will fully complete the work ready for use not-, later than 150 calendar days after the date of receipt, of notice to -proceed.
*269 4. Plaintiff’s bid was in the total sum of $396,610, and plaintiff was the low bidder as was learned by plaintiff when the bids were opened and read at the appointed time.
5. By registered letter dated December 21, 1951, the District Engineer, Walla Walla District, Corps of Engineers, advised plaintiff in pertinent part as follows:
Deference is made to Invitation No. CIVENG-45-164-52-35, for construction of intake structure and outlet diversion, Lucky Peak Dam, near Boise, Ada County, Idaho.
You are hereby notified that your bid in the sum of $396,610.00 covering the above work, is accepted. You are further notified that the Government shall not be obligated in this transaction until you have furnished acceptable performance and payment bonds, the contract is fully executed, and you have received written notice to proceed with the work.
Contract No. DA-4-5-164 — eng-1527, performance and payment bonds were delivered to you in quadruplicate this date. Please execute the contract and bonds in triplicate and return same to this office. One copy of each paper is for the files of the surety company. After the contract has been executed on behalf of the Government, one copy will be returned for your files.
The contract document referred to in the above-quoted letter was prepared on Department of the Army form DA AGO Form E-5701, stated that it was entered into as of December 21, 1951, was complete in all details, but lacked the signatures of the parties. Plaintiff executed and returned the contract document in triplicate and thereafter on February 2, 1952, received back from the Walla Walla District Office one of such copies, signed in behalf of the defendant by the District Engineer, without any change.
6. By letter dated January 8, 1952, received, by plaintiff on January 14, 1952, defendant’s District Engineer advised plaintiff in pertinent part as follows:
Eeference is made to your contract No. DA-45-164eng-1527, dated December 21, 1951, for construction of intake structure and outlet diversion, Lucky Peak Dam, Boise, Ada County, Idaho.
Your attention is invited to paragraph SC-1 of the specifications attached to the above contract, which *270 stipulates that the Contractor will be required to commence work under this contract within 5 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than 150 calendar days after the date of receipt of notice to proceed. The time stated for completion shall include final clean-up of the premises. You are hereby notified to proceed in accordance with the terms and conditions of this contract.
7. Article 1 of the contract and paragraph GC-1 of the specifications provided that for the consideration of $396,610, plaintiff would furnish all plant, labor, materials, and equipment and perform all work in strict accordance with the specifications, schedules, and drawings for construction of intake structure and outlet diversion of the Lucky Peak Dam. Paragraph SC-1 of the specifications required that the plaintiff commence work on the contract within 5 calendar days, and that the entire work be completed ready for use not later than 150 calendar days after receipt by plaintiff of notice to proceed. Such notice having been received on January 14, 1952, the contract completion date was June 12,1952.
The contract further provided that in case of failure to complete the work within the contract time or any extensions thereof, the contractor would pay the defendant as liquidated damages the sum of $300 for each calendar day of delay.
The contract work was completed on August 21, 1952. Extensions of time having been granted for all but 29 calendar days, liquidated damages were assessed by defendant in the sum of $8,700 and withheld from sums otherwise due plaintiff.
8. All claims in this case have been presented on their merits to and decided in favor of defendant by the defendant’s contracting officer and the Corps of Engineers Claims and Appeals Board, hereinafter referred to as the Board. Other claims which were presented to and decided in plaintiff’s favor by the Board have been concluded by monetary and time extension allowances, as more specifically stated in subsequent findings.
*271 The full record of the administrative proceedings is in evidence in this case, including the transcript of the hearing and of the testimony of witnesses before the Board, documents received in evidence by the Board, and other pertinent papers forming the framework of the administrative proceedings on plaintiff’s claims. Plaintiff presented no additional proof in the trial of this case on the issues of liability, stating that it relied solely on the administrative record except for questions pertaining to damages. Damage issues were not heard by the Board, its proceedings being conducted on the understanding that to the extent to which plaintiff’s claims were sustained by the Board, there would be a remand of the issues of amount of recovery for initial determination by the contracting officer, subject to appeal to the Board. On the claims which the Board decided in favor of plaintiff, such a remand was made, the contracting officer made a decision as to amounts of recovery, and an appeal was taken but subsequently withdrawn by plaintiff.
The proof adduced by plaintiff before this court (other than the administrative record) consisted of the testimony of one witness (Reynolds) concerning its claimed costs and exhibits in support thereof.
At the commencement of its direct case before this court, defendant’s trial attorney stated that its case would consist “principally, in fact entirely” of presentation of evidence on the damages allegedly sustained by plaintiff, that the basic defense was finality of the decision of the Board, but that defendant would adduce evidence to establish that plaintiff’s claimed damages were not in fact sustained and were attributable to factors other than those asserted by plaintiff. This position resulted in the presentation de novo before this court of a considerable amount of testimony and documentary evidence in behalf of defendant concerning plaintiff’s contract performance.
9. Article 3 of the contract contained the usual “Changes and Extras” provision that the contracting officer could in writing order extras and make changes in the drawings and/or specifications, subject to equitable adjustment of the contract price by agreement or by the administrative procedure provided under the “Disputes” article.
*272 10. Article 4 of the contract provided as follows:
4. Changed Conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
11. The contract provided in Article 5 that the Government could terminate the contractor’s right to proceed with the work if the contractor refused or failed to prosecute the • work with such diligence as would insure its completion within the time specified in the contract, or any extension thereof. If the Government elected not to terminate, the contractor was required to continue performance, subject to liability to the Government for the agreed liquidated damages for each calendar day of delay, or if such damages were-not fixed, any actual damages occasioned by such delay.' Article 5 further provided as follows:
(c) The right of the contractor to proceed shall not be terminated, as provided in subparagraph (a) hereof, nor the contractor charged with liquidated or actual damages, as provided in subparagraph (b), because of any delays in the completion of the work due to causes beyond his control which could not reasonably have been anticipated and were without his fault or negligence, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, either in its sovereign or contractual capacity, acts of .another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes,, freight embargoes, and unusually severe weather or de *273 lays of subcontractors due to such causes: Provided, That the contractor shall, within 10 days from the beginning of any such delay, unless the contracting officer shall grant a further period of time prior to the date of final settlement of the contract, notify the contracting officer in writing of the causes of delay. The contracting officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
12. Article 6 of the contract provided as follows:
6. Disputes. — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the contractor. Within 30 days from the date of receipt of such copy, the contractor may appeal by mailing or otherwise furnishing to the contracting officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; provided that, if no such appeal is taken, the decision of the contracting officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer’s decision.
The term “his duly authorized representative,” as used in Article 6, was defined in Article 27 to mean “the Chief of Engineers, Department of the Army, or an individual or board designated by him.”
13. Article 31 of the contract provided that in order to protect the life and health of employees, prevent damage to property, and avoid work interruptions, the contractor would comply with certain safety requirements issued by the Chief of Engineers, and also take such additional measures as the *274 contracting officer determined to be reasonably necessary for the purpose. Article 31 (c) further provided, as follows:
(c) The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately correct the conditions. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.
14. Following a general description of the work to be done under the contract, paragraph SW-2 of the specifications provided as follows:
SW-2. Peinoipal features. — a. Scaling and preparation of excavated intake area.
i. Construction of Low Intake Structure.
c. Construction of Outlet Diversion.
d. Excavation of Diversion Channel.
The above general outline of principal features does not in any way limit the responsibility of the Contractor to perform all work and furnish all plant, labor and materials required by the specifications and the plans and drawings referred to therein.
15. Following general statements concerning the scope of the work under the contract, paragraph GC-3 of the specifications provided as follows:
GC-3. Site investigation and representations.— The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters upon which information is reasonably obtainable and which can in *275 any way affect the work or the cost thereof under this contract. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that the responsibility threfor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor.
16. Following a provision for submission by the contractor of progress schedules to the contracting officer, paragraph GC-5b of the specifications provided as follows:
5. The Contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shift and overtime operations, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts and/or overtime operations, days of work, and/or the amount of construction plant, all without additional cost to the Government.
17. Paragraph GC-10 of the specifications provided as follows:
GC-10. POSSESSION PRIOR to completion. — The Government shall have the right to take possession of or use any completed or partially completed part of the work. Such possession or use shall not be deemed an *276 acceptance of any work not completed in accordance with the contract. If such prior possession or use by the Government delays the progress of the work or causes additional expenses to the Contractor, an equitable adjustment in the contract price and/or the time of completion will be made and the contract shall be modified in writing accordingly.
18. Paragraph 1-01 of the specifications, as amended by the above-mentioned Addendum No. 1 to the Invitation for Bids, provided as follows:
1-01. Scope. — The work to be done under this section consists of furnishing all labor, plant, equipment, and materials and performing all operations necessary to accomplish the common and rock excavation, foundation cleanup, and scaling required under this contract in accordance with these specifications and drawings. Excavation for construction of intake structure will be done by others.
The amendment consisted of addition of the last sentence to the paragraph as stated in the invitation.
19. Paragraph 1-02 of the specifications, as amended by Addendum No. 1, provided as follows:
1-02. General. — Excavation shall be made to sufficient depth to secure a satisfactory foundation as determined by the Contracting Officer. The materials to be excavated consist of clay, sand, gravel, and basalt. Foundation cleanup will be required under the intake and downstream diversion structures. Scaling shall be performed as required to maintain work areas in a safe condition.
This paragraph was stated in the same language as in the invitation (prior to amendment) except that the words “work areas” in the last sentence were used instead of the word “excavations.”
20. Paragraph l-03d of the specifications, as amended by Addendum No. 1, provided as follows:
d. Foundation Cleanup and Scaling. — Work described as “Foundation cleanup” shall include removal of loose material by barring and wedging or by other suitable means satisfactory to the Contracting Officer, and cleaning the rock surfaces, prior to placing any concrete thereon, with air and water jets in a manner meeting the *277 approval of the Contracting Officer. Foundation cleanup shall he performed in all areas to be covered with concrete as shown on the drawings. Scaling shall include the removal of loose rock from all slopes as required to maintain all work areas in a safe condition without hazards of rock falls.
The amendment consisted of restating the paragraph to change only the terminology of the last sentence as such paragraph was stated in the invitation, such sentence having previously provided: “Scaling shall include the removal of loose rock from excavated slopes to maintain work areas in a safe condition.”
21. Paragraph l-04b of the specifications, as amended by Addendum No. 1, provided as follows:
b. Foundation Clearmp and Scaling. — In areas upon or against which concrete is to be placed loose rock shall be removed and the surface shall be cleaned with air and water jets under high pressure. If the foundation is found to be unsatisfactory, additional cleanup shall be performed as directed by the Contracting. Officer and the surface shall be cleaned again as specified above. This procedure shall be repeated until the foundation is approved. As necessary for safety, loose or fractured rock shall be scaled and removed from work areas.
Prior to the amendment, the invitation set forth this paragraph as follows:
b. Foundation Cleanup and Scaling. — When excavation of rock in areas upon or against which concrete is to be placed has been completed to the grade required, loose rock shall be removed and the surface shall be cleaned with air and water jets under high pressure for the purpose of inspection. If the foundation is found to be unsatisfactory, additional excavation shall be made as directed by the Contracting Officer and the surface again cleaned for inspection. This procedure shall be repeated until satisfactory foundation is reached. As necessary for safety, loose or fractured rock shall be scaled from excavation slopes.
22. Paragraph I-05b of the specifications provided as follows:
b. No separate or direct measurement or payment will be made for foundation cleanup and scaling, since *278 the work and cost thereof shall be considered incident to, included in, and paid for under the contract prices for concrete bid items.
23. Paragraphs 2-lla (in part) and SC-15 (in part) of the specifications provided as follows:
2-11. Batching and mixing. — a. Equipment. — The Contractor shall provide at the site of the work a modern and dependable batch-type mixing plant with a minimum capacity of 300 cubic yards of concrete in eight (8) hours. Mixers of lesser capacity may be used in the construction of small structures with the approval of the Contracting Officer. The equipment shall be capable of combining the aggregate, cement, admixture if used, and water into a uniform mixture within the time limit specified and of discharging this mixture without segregation. Adequate facilities shall be provided for accurate measurement and control of each of the materials entering the mixer. Tilting or other approved type mixers will be required. Any waste resulting from faulty operation of batching equipment, over-batching of materials, or other causes will be charged to the Contractor. The complete plant assembly shall include provisions to facilitate the inspection of all operations at all times. All records and charts of the batching and mixing operation shall be prepared as required herein and shall become the property of the Government. * * *
SC-15. Plant. — The Contractor agrees to keep on the job sufficient plant to meet the requirements of the work. The plant shall be in satisfactory operating condition and capable of safely and efficiently performing the work as set forth in the specifications and the plant shall be subject to inspection by the Contracting Officer at all times. * * *
24. The contract drawings contained, among others, a sheet designated as “Foundation Exploration” showing-diamond drill holes and log profiles on the central lines of the tunnel inlet channel and tunnel. None of these holes or logs was in the immediate area of the slopes above the intake channel although several were in the general vicinity. The closest holes and logs portray a profile of miocene basalt rock in columnar formation along the lines of the inlet channel. Two of the four notes thereon stated:
1. Logs may be examined at Office, Eesident Engineer, Lucky Peak Dam or District Office, Walla Walla, Wash. *279 Cores from diamond drill holes are available for examination at Project Office, Lucky Peak Dam.
4. Fault and joint systems known to exist in inlet area are not represented on this drawing.
25. At the location of the Lucky Peak Dam on the Boise Diver, the river flows through a valley having fairly steep banks extending upward and away from the river channel. The left abutment of the dam site, consisting of a long ridge, 200 feet or more in height, rose steeply from the river valley.
The overall project was scheduled for construction in five separate stages or phases. Phase 1 was the construction of a permanent diversion tunnel about 1,300 feet through the left abutment, constructed early in the overall project to carry the flow of the river during completion of the dam embankment and its appurtenances. Phase 2 was for the construction of a temporary diversion channel, extending downstream along the extreme left side of the river valley at the foot of the left abutment, and the placement of a major part of the dam embankment, not across the entire dam site but from the right abutment across the river channel, sloping toward the foot of the left abutment but not closing the diversion channel. Phases 1 and 2 were accomplished prior to the issuance of the invitation for bids in this case.
Phase 3 included the work involved in this case, consisting of the construction of the lower portion of the permanent tunnel intake structure and a temporary outlet channel from the lower end of the tunnel to the river. Phase 4 consisted of completing the placement of the main dam embankment across the entire dam site to required elevation, necessarily filling and covering the temporary diversion channel, and re-requiring use of the diversion tunnel to carry the river flow. Phase 5 consisted of the construction of the higher portion of the tunnel intake structure, certain tunnel outlet works, and the spillway section and all other items necessary to complete the operational facilities of the dam.
During the time that the work was done on Phase 3, the flow of the river was to be through the temporary diversion channel constructed under Phase 2. During the Phase 4 operations, the river was to be carried through the tunnel and the other works accomplished under Phases 1 and 3.
*280 26. As part of the accomplishment of the tunnel phase (Phase 1) of the project, an intake channel had been excavated, leading to the upstream portal of the tunnel. This-channel involved a cut into the side of a steep hill overlooking the left bank of the river. The cut described a steep semi-circular slope above and around the tunnel entrance,, with the angles of slope varying from nearly vertical in the lower portions to about 2 on 1 in the upper. The slope on the left side rose to an altitude of about 195 feet above, the floor of the intake channel at and near the tmmel entrance, with the altitude progressively less around to the right side of the cut, where the height of the slope was relatively low.
Within the month prior to the invitation and submission of bids involved in this case, the construction company which performed the Phase 2 work was awarded a contract modification pursuant to which it did the necessary excavation for the foundation for the tunnel intake structure, and incidental to this excavation, scaled the slopes above the tunnel entrance area.
27. The low intake structure, constructed of reinforced concrete, was erected under plaintiff’s contract as a permanent installation immediately adjacent to the upstream portal of the tunnel. It required placement of about 7,400 cubic yards of concrete. The tower of this structure was to have an ultimate height of 225 feet, and plaintiff’s contract was for construction of the lower 70 feet.
The low intake structure was to be constructed in 12 lifts or concrete pours. The base or foundation, 8 feet thick, was a composite unit, comprised of 3 lifts. Above the foundation, the structure was divided into 3 sections, a center pier and a right and left wall, with the water to flow through the spaces between the walls and the pier into the tunnel opening. This part of the structure was comprised of 3 lifts, each 8 feet high. Above the tunnel opening, the low intake structure again became a composite unit, comprised of 6 lifts, each 8 feet high.
28. The outlet diversion work of plaintiff’s contract consisted of (a) excavation of a temporary diversion channel to carry the flow of water from the tunnel outlet to the river, *281 and (b) construction of a temporary mass-concrete gravity-type wall or structure to divert the water from the already constructed permanent tunnel outlet channel into the temporary diversion channel. These temporary outlet diversion works were constructed for the purpose of keeping the. river flow out of the permanent tunnel outlet channel during construction of certain outlet facilities under a future contract. The excavation was principally sand and gravel with a relatively small amount of rock removal. The mass concrete placement for the diversion wall amounted to about 2,100 cubic yards.
Access from the outlet to the inlet area of the tunnel involved a circuitous route across the crest of the ridge at fairly substantial grades for a distance of over a mile.
29. The exposed semi-circular slope above and about the tunnel entrance was composed of jointed and fractured basalt, as clearly established by the testimony of witnesses and as shown by photographic exhibits in evidence, both before the Board and this court. It was commonly known that such material has a tendency to ravel under erosive conditions, resulting in pieces of rock falling by force of gravity down such a slope. Such fractured basalt formations are common in extensive areas of the Pacific Northwest, with highway cuts through such material being posted with signs warning motorists of the danger of falling rock, and with like railroad cuts protected by fencing.
During prolonged freezing weather, formation of ice stabilizes such a slope by binding the fractured and jointed material in position, minimizing the amount of raveling. Alternate freezing and thawing of moisture in the crevices and joints accelerate raveling markedly, with increases also in periods of rain or wind.
Scaling of such a slope is accomplished by workmen, classed in the trade as scalers, each of whom suspends himself on the slope by means of a rope firmly secured above, and manually pries or wedges any loose or potentially loose rock from the surface by use of a short steel bar. The scalers work as a crew from the top of the slope downward, working at about the same level, thus avoiding injury to any scaler *282 by the fall of scaled rock. The contract contains a classification for “high scalers” at a rate of $1.95 per hour.
On the basis of the administrative record it is found that it should have been obvious to any competent contractor upon inspection of the site that such raveling would occur on the pertinent slope and that periodic scaling would be necessary to protect exposed workmen in the tunnel intake area. The same finding is made on the basis of the entire record in this court.
30. Sources of sand and gravel, approved for use in making the specified concrete aggregate for the contract performance, were listed in the specifications, and the Government-owned sources adjacent downstream to the dam site were made available without cost, with the privately owned sources available at plaintiff’s cost.
Plaintiff was permitted by the specifications to furnish sand and gravel from any other source, but was required to submit samples thereof to the defendant’s contracting officer 60 days prior to the time such aggregates would be required for the work, for approval on the basis of the requirements of the specifications for such aggregates.
31. On and about November 19, 1951, Messrs. Leonard, Hunt and Willett made a pre-bid site investigation of the proposed contract work for a part of two or three days. Mr. Leonard testified before the Board that he observed the slope at the tunnel entrance from above, side and below, and thought it looked good, clean and excellent, and laid back at a flatter angle than normally expected in rock. The slope had been recently scaled by the contractor then performing the excavation for the foundation for the low intake structure. He observed some men working at the base of the slope with a dragline. There was no protective screen on the slope over the work area to catch raveling, and Mr. Leonard considered this an indication of stability of the slope, justifying an assumption that raveling would be minor. He discussed with his associates the erection of such a netting to protect their workmen and assure them of plaintiff’s concern for their safety. He admitted that he knew that alternate freezing and thawing cause raveling of a rock slope, as would *283 rain on some slopes, and that as a resident of Boise, Idaho, he knew that periods of freezing, thawing, and rain were recurring winter and spring phenomena. He also stated that he expected to have to scale after such periods of freezing, thawing and rain, and that he thought it would be done at times which would not interfere with progress of the work, such as on Sundays and holidays. He testified that he did not expect continuous raveling during sunny, windy, or rainy periods, and did not anticipate having to scale every four weeks.
Plaintiff made no inquiry of the contractor or its personnel working at the site of the intake structure concerning the slope. If it had, it is reasonable to conclude that it would have then known, as it later learned, that the slope had just been scaled and was being observed under its best conditions. If inquiry had been made then as it was later, plaintiff could have obtained information which it later made part of the record before the Board that the inlet channel excavating contractor experienced great difficulty with falling rock after freezing at night began, that costly protective works had to be installed, and that workers were kept out of the area after about ten o’clock in the morning when the slope started to thaw. Plaintiff also placed in evidence before the Board letters from two contractors who bid on the pertinent invitation, who stated that they contemplated the use of watchmen to warn of raveling rock in lieu of protective works. One of these bidders stated that it expected that “considerable scaling” would be required on the slope. An engineering firm retained by plaintiff reported on the basis of its inspection of the slope on July 15, 1952, that the rock on the slope appeared to be severely fractured and weathered, and of relatively low strength.
32. In early December 1951, plaintiff’s Messrs. Willett and Leonard and plaintiff’s proposed aggregate subcontractor called on defendant’s project engineer at the project office to discuss job planning and performance. They indicated that they proposed to set up a plant to produce aggregate by a wet screening process from materials obtained in the excavation of the outlet diversion channel. The project engineer *284 warned them of the difficulties involved in production by this process in winter weather. He also reminded them of the time required for submission of samples of materials for approval, and cautioned that both matters could be major problems under the 150-day job performance time. They were further advised that approved aggregate was available from nearby commercial sources, obtainable upon call. Plaintiff’s representatives advised that they intended to winterize the plant to avoid the problems of wet screening in freezing weather.
Defendant’s project engineer then advised plaintiff’s officers that in his opinion it was imperative that plaintiff proceed to make substantial progress during the winter on the placement of the lower levels of the concrete intake structure in order to have the structure high enough before freezing weather ended to make the work areas relatively safe from raveling accelerated by alternate freezing and thawing in early spring, whereas, if the work was being done on the floor level when spring came, there would be times when working conditions would be untenable. Mr. Willett replied that defendant’s project engineer was unduly concerned.
33. Upon receipt of its notice of award on December 21, 1951, plaintiff commenced mobilization for the contract performance, and in early January 1952, prior to its receipt of notice to proceed, moved equipment to the site, erected a project office, started construction of a bridge across the temporary diversion channel, and through a subcontractor commenced erection of a plant for production of aggregate. These facilities were located downstream near the tunnel outlet area. In January and February plaintiff engaged in construction of a wet-mix batch plant near the aggregate plant and the erection of a high line or cableway suspended over the tunnel inlet area, extending from a head tower located on the slope of the dam embankment to a concrete block placed on the top of the hill. The planned use of the high line was to carry concrete buckets from the top of the hill into position over the tunnel entrance area to place concrete in the intake structure, substantially reducing the distance of *285 the haul of the buckets from the batch plant to the tunnel entrance.
34. Plaintiff, on its own initiative, scaled the slope above the tunnel entrance within the period January 29 through February 4, with 148 scaler manhours used. Plaintiff then •erected by February 6 a catwalk on the face of the slope about '60 to 70 feet above the floor of the intake channel. This •device, not required by nor mentioned in the specifications, consisted of planks resting on steel bars inserted into holes .drilled into the cliff at 5-foot intervals, with a 3-foot-high -wire mesh or cyclone fence at the outer edge. Designed to •entrap raveling rock, the catwalk was only partially effective because with the slope above rough and irregular with humps ■at various elevations, the raveling rocks hit the humps and bounded into the work area below. When scaling of the slope was conducted thereafter, it was necessary to remove the ■ catwalk, after which it was reinstalled.
35. Plaintiff did not winterize its aggregate plant, and no ■production of aggregates was accomplished in January and February. It had built a large stockpile of materials to be •processed in the plant, but attempted washing and screening ■operations were ineffective because the freezing weather ■caused formation of ice on the screens, belts, and in the materials, resulting in plant breakdowns. Effective operations fbegan on March 3,1952, and by March 6, the estimated quantity of suitable aggregate produced was sufficient for only 800 ; yards of concrete. Plaintiff first delivered aggregate samples to defendant for the required testing in late February, .-and defendant then arranged for its testing laboratory to work on a weekend, and waived the standard 28-day cylinder test.
36. The construction work accomplished in January and February, as distinguished from plant construction and other •preparatory activities, consisted of some excavation of materials from the area of the temporary tunnel outlet channel, 'being the source of aggregate materials, and thorough cleaning and thawing to sound rock of the site on which the ■ concrete pour was to be made for the foundation of the low intake structure.
*286 Throughout February, temperatures remained consistently low, the slope remained stabilized, and raveling from the slope was not substantial.
37. In the first week in March, it was discovered that insufficient space had been provided under the batch plant to permit trucks to be loaded from the mixers. To remedy this, an attempt was made to raise the mixers closer to the hoppers, unsuccessful because the chutes were leveled to the extent that aggregates would not flow through them to the mixers. An effort was then made to provide the necessary space by excavating under the plant between its supporting legs, but this procedure was abandoned because of the threatened undermining of the sills supporting the legs.
Plaintiff then decided to abandon its plans for a central mix plant, use portions of the facility to dry batch, and procure a paver for mixing concrete.
38. The foundation of the intake structure was ready for its first pour on March 5, but plaintiff had no workable facilities for producing fresh concrete at the site. Plaintiff then sought and obtained permission from defendant to use ready-mix concrete from a commercial source for the first two pours of the intake, and also advised that it would take immediate steps to acquire a paver for use in future concrete placement. The pouring of the first lift of the intake structure was accomplished by use of the transit-mix concrete on March 6 and 7,1952.
39. Alternate freezing and thawing started in early March, with a substantial increase in the amount of raveling, the raveling material being about gravel size. No scaling of the slope had been done for somewhat more than a month. Injuries from falling rocks having occurred to two workmen in the inlet channel, defendant’s project engineer on March 8, 1952, advised plaintiff that it would be necessary to scale the slope before starting the second pour. On the following day, considerable raveling required postponement of the pour. On March 10, 1952, three workmen were injured by falling rock, and defendant’s project engineer directed plaintiff to remove all men from the inlet channel area until scaling of the slope had been performed. On the same date, *287 plaintiff was directed in writing by defendant’s project engineer to comply with, the provisions of Article 31 and paragraphs 1-02 and 1-03 of the specifications by scaling the slope and removing all loose rock before continuing further work in the bottom of the channel. Plaintiff was also instructed that the slopes were thereafter to be scaled periodically as necessary to maintain all work area in safe condition without hazards of rockf all.
40. The scaling was accomplished during the period from March 9, 1952, through March 31, 1952, delayed in part by inclement weather and also by insufficient crew and equipment with inadequate supervision. A total of approximately 600 scaler manhours was used during this period.
Defendant’s project engineer estimated that raveled and scaled rock from the slope amounted to about 5 cubic yards during the above-mentioned period in March.
41. On March 19, 1952, plaintiff brought onto the job site a used dual-drum Bex paver which was not in operating condition. Eepairs to prepare it for a test run continued throughout the balance of the month. By March 28, 1952, no concrete pours had been accomplished either in the outlet or inlet areas of the tunnel except the first lift of the foundation of the low intake structure. Plaintiff’s job performance was without adequate equipment, organization and supervision.
42. On March 28,1952, defendant’s project engineer called a meeting of plaintiff’s and defendant’s supervisory personnel, at which he stressed the need for timely completion of the job and requested immediate improvement in job planning and prosecution. Plaintiff was directed to take immediate steps to improve its progress by April 19, advised that a further check would be then made to evaluate the results achieved, and, if necessary, to invoke the provisions of paragraph GC-5 of the specifications to accelerate the job prog-gress and get the work back on schedule at the earliest possible date. Letters detailing the conference discussions were on April 2 and 4 sent to plaintiff and its bonding company.
*288 43. On April 1,1952, the paver was first used, accomplishing a pour in the tunnel outlet diversion, by placing only 186 cubic yards in 12 hours, or at a rate of 15.5 cubic yards per hour. After pouring 10 or 15 yards, the paver’s transfer gates broke down, and it was necessary after several hours spent in an unsuccessful attempt to correct this condition, to limit the use of the paver to one of its dual mixers in order to complete the pour before cold joints developed.
On April 3, 1952, the paver was again used, commencing the placement of a concrete slab in the outlet channel. The concrete produced was inconsistent and barely met minimum requirements even for the lesser quality of concrete permitted in the temporary outlet structure. While this pour was proceeding, the high line was tested by safety inspectors and representatives of both parties. The inspection revealed necessary alterations and repairs before use for anything but minor light operations, and plaintiff was advised that these had to be accomplished before the high line could be used for the planned placement of concrete in the intake structure.
On April 4, the pour commenced the previous day was completed, with 895 cubic yards of concrete having been poured in 22 hours, or about 18 cubic yards per hour. The concrete produced continued to be inconsistent, and among the obvious paver repairs necessary were correction of the measuring device controlling the water-cement ratio, repairing and setting the timing and locking devices, and further repairs to the transfer gates between the two drums.
44. By letter dated April 4, 1952, defendant’s project engineer advised plaintiff that its rates of placement of concrete on the two pours in the outlet diversion were 15 and 18 yards per hour, whereas the contract specifications required a mixing plant with a minimum capacity of 300 cubic yards in 8 hours; that plaintiff’s dual drum paver had not been satisfactory from the standpoint of quantity and quality of concrete produced; that although equipped with two drums, it had been necessary to permit the paver to operate as a single drum unit to complete the pours; that the inconsistent concrete produced had been tolerated in the outlet diversion because of its temporary nature, but would not be *289 permitted in the permanent lower intake structure; and that concrete would have to be produced in sufficient quantities to avoid cold joints. Calling attention to paragraph SC-15 of the specifications, defendant’s project engineer requested plaintiff either to place its paver in proper condition to produce quality concrete in ample volume to meet the requirements of the specifications, or obtain other concreting equipment capable of doing so.
45. Following repairs, the paver was transferred to the inlet area and used for a period of 25.75 hours on April 6 and 7, 1952, to pour 395 yards of concrete for the second lift of the intake structure, the rate of pour being about 15.3 cubic yards per hour. The quality of the concrete was much improved over the previous pour.
46. Having been transferred from the inlet area back to the outlet site, the paver was used for pours in the temporary diversion works on April 9,11,12, and 16, with rates of pours similar to those previously experienced, with inconsistent concrete produced, and with recurring difficulties in the ■operating condition of the paver.
On April 17, 1962, plaintiff advised defendant’s project engineer that it planned to move the paver back to the inlet •channel and keep it there until the lower intake structure was completed, and that plaintiff would obtain another mixer to complete the outlet diversion. No mixer other than the paver was used by plaintiff in the contract performance.
47. By April 12, 1952, the required reinforcing steel mat was in place for the pour of the third lift in the low intake structure, being the top lift of the foundation. Vertical steel for the center pier and walls, supported in place in concrete and tied in vertical position, extended 24 to 30 feet above the top of the horizontal mat.
On that date, plaintiff stockpiled 7 tons of incoming steel ■on top of the mat in place, causing the mat to collapse and pull down the vertical steel. Damage was extensive, requiring a full week to remove, repair and replace vertical steel, •and to repair and replace the horizontal mat.
Plaintiff was instructed by defendant’s project engineer to place a qualified supervisor in charge of the reinforcing *290 steel work. Plaintiff on April 14 subcontracted all steel work, and thereafter such performance was efficiently prosecuted. The outlet diversion had no reinforcing steel.
No concrete was placed in the intake structure in the period from April 7 to April 20. With the paver transferred back to the inlet area, the third lift of the intake was poured on April 20 and 21, with 750 cubic yards of concrete in 46 hours, or a rate of 16 yards per hour.
48. The transfer of the paver back and forth between the inlet and outlet areas ivas over the difficult and circuitous route described in finding 28, with the same route used for trucking of aggregates from the dry batch plant to the paver whenever operated at the inlet area.
The transfer gates between the two drums of the paver frequently broke down, and the paver was used as a single mixer unit during a substantial part of the overall concrete pouring operations, resulting in slow and extended pouring operations, with other breakdowns of the paver frequently idling crews.
49. Plaintiff never accomplished construction of the high line so that it could be used as planned to lower buckets of fresh concrete from the top of the hill for pouring any of the lifts of the lower intake structure. The only attempt to use it in this manner was made on April 20, prior to the commencement of the third lift pour, when the bucket suspended on the high line could not foe controlled by the siwash line provided, and destruction of the vertical steel and injuries to workmen were seriously threatened.
The high line was also defective in that its hoisting device was inoperable for months, but was finally developed to lift only a minimal load off the ground, as hereinafter related in finding 54.
50. On April 23 and 25,1952, the paver was used for pouring concrete in the outlet diversion, and on April 28 and 30 and May 1, for pouring the fourth lift of the intake.
During the period of pouring on the intermediate lifts of the low intake structure, plaintiff had a platform erected above the pouring areas with a hopper placed above the platform. Plaintiff had a crane located near the paver on *291 the tunnel inlet floor, and the buckets of fresh concrete were lifted by the crane and discharged into the hopper. From the hopper, the fresh concrete was discharged into buggies which were pushed on the platform by workmen to the point of discharge. This system was used in the intake structure until mid-June when the crane could no longer reach the upper levels.
51. No scaling of the slope was performed during the period after March 31 and through May 8, 1952. Raveling from the slope was minor during that time except on April 14 and May 7 and 8, on which days heavy rains increased the raveling to the extent that workmen were removed from the inlet channel area.
By May 6, 1952, the fifth lift of the right and left walls and the fourth lift of the center pier of the intake had been poured.
52. At about 3:30 p.m. and 11:00 pan. on May 8, 1952, rock slides occurred on the left face of the slope above the intake structure work area, smashing forms and damaging construction materials, equipment and concrete in place in the left wall of the structure. The total volume of the slides was about 100 cubic yards, and they were major rockfalls, as distinguished from raveling or sloughing, both as to quantity and the deep-seated, subsurface character and source of slippage.
Progress in the intake structure work was delayed from May 8 to May 26, 1952, while the area was cleared, the slope scaled, and damage repaired. Thereafter no scaling of the slope was performed, with minor raveling occurring on a few rainy days in June 1952.
53. On May 9, 1952, the paver was moved back to the tunnel outlet area, and several pours of mass concrete were made in the outlet diversion in the period May 12 to 23, with a slow rats of pouring and further breakdowns of the paver. The pour of the fifth lift of the center pier of the low intake was done on May 26, 1952, with the pours of the sixth lifts of the center pier and right and left walls accomplished on May 28-29, May 30-31, and June 1.
*292 On June 3, the paver was again transferred back to the outlet area, where it was used for minor concrete pours on June 5 (with breakdown preventing completion of planned-operation); on June 6 (with pouring interrupted by paver breakdown); and on June 9, when placement of concrete in the outlet diversion was completed.
54. With the paver back in the intake channel, and with the continued use of a crane alongside, the pouring of the seventh lift of the low intake structure was accomplished on June 12 and 13, 1952. At this time the low intake had reached such a height of construction that plaintiff’s crane could no longer reach high enough to be used in subsequent concrete pours. With the high line not safely usable for pouring concrete by bringing buckets down from the top of the hill, plaintiff could either obtain a larger crane or build facilities to permit use of the high line to lift or hoist concrete from the ground, and the latter alternative was followed.
On June 17, 18, and 19, 1952, plaintiff removed the existing scaffolding and constructed a timber floor between the center pier and walls of the structure at about 28 feet above the foundation, leaving the space below the floor unobstructed for flow of water when diversion of the river through the tunnel was to be made. The scaffold was then re-erected on top of the floor, and an opening was left in the portion of the floor constructed between the right wall and center pier so that a concrete bucket could be hoisted vertically by the high line from the bottom elevation of the inlet to the top of the structure. The high line was thus used in the pours on most of the remaining lifts of the structure. The hoisting machine had the capacity to lift only 1*4 cubic yards of concrete in a bucket, whereas plaintiff had planned to have one of sufficient power to lift 2 to 3 cubic yards of concrete.
55. Plaintiff’s failure to provide the required concrete plant and its use of inadequate substitute facilities substantially delayed the overall progress of the contract performance.
Such delay continued throughout the pours of the last six lifts of the low intake structure. Each of lifts 7 through 12 should reasonably have been poured in one uninterrupted *293 operation, and could have been if the required batch plant, or adequate substitute facilities had been provided. Instead it was necessary for the defendant to permit plaintiff to make more than one pour for each lift, as many as four on one lift, which procedure required placing of bulkheads within the lift and caused delay because the concrete had to set before the bulkhead could be removed for the nest pour within the lift.
56. Further evidence of lack of organization and inadequate supervision on plaintiff’s contract performance were repeated instances of its failure to conduct concrete curing operations, requiring defendant’s representatives in some instances to water down a new pour, and in others, to notify plaintiff to place personnel on this work. Inadequate supervision in checking elevations of rock excavation adversely affected concrete pouring by requiring extreme care in blasting rock close to freshly poured concrete, or requiring postponement of a scheduled pour until further rock had been removed. Plaintiff permitted unsafe conditions with respect to mobile and stationary plant and equipment to exist to the extent that it was repeatedly necessary for defendant to request corrections.
57. By July 18, 1952 (the contract completion date as extended by defendant’s contracting officer, as related in subsequent findings) plaintiff had poured only part of the 11th lift of the intake structure, and still had the twelfth or final lift to pour.
By letter dated July 11, 1952, defendant advised plaintiff that certain parts of the unfinished work had to be completed prior to July 20, 1952, on which date the temporary diversion channel would be closed in the Phase 4 operations on the overall project, with the river then diverted through the tunnel. The designated unfinished work included clearing of debris, muck, and equipment from the inlet channel and temporary outlet channel, as well as completing the concrete finish work on the lower portion of the intake structure.
Plaintiff then transferred the paver to a point on the right bank of the temporary diversion channel, near the head tower of the high line, and thereafter fresh concrete was *294 picked up at the paver and transferred by the high line to make the remaining pours in the intake structure.
58. The last pour on the eleventh lift was made on July 22,1952.
The river was diverted through the inlet channel and lower intake structure into the tunnel and through the temporary outlet diversion works on July 25, 1952.
The twelfth and last lift was poured on July 29 and 30, 1952, leaving only the pouring of two struts to complete the concrete placement, which was accomplished August 3, 1952.
Finishing and curing of concrete, stripping of forms, general cleanup, and other necessary operations were thereafter accomplished, and plaintiff’s contract performance was completed on August 21,1952.
CLAIM ROE REMISSION OE LIQUIDATED DAMAGES
59. By Modification No. 4, dated June 30, 1952, defendant’s contracting officer, on consideration of the various claims of the plaintiff, extended plaintiff’s contract performance time to and including July 18, 1952, upon his determination that 36 calendar days of delay in the plaintiff’s performance were due to causes beyond its control and without its fault or negligence, namely, unusually severe weather conditions which reduced the efficiency of operations and delayed completion of necessary scaling and the occurrence of a slide suspending placement of concrete.
In his subsequent formal findings of fact, defendant’s contracting officer found that of the 36-calendar-day extension allowed, 7 days of such delay occurred because of reduction in efficiency in erection of the concreting plant, due to unusually severe weather during the period of February 13 through March 5, 1952; that 11 days of such delay occurred because of reduction in efficiency in scaling the intake area slope due to unusually severe weather during the period March 9 through 31, 1952; and that 18 days of such delay were justifiable for the period between May 8 and 26, 1952, when repair of damage and cleaning of the site was required by the rockslides on May 8.
*295 80. To the extent to which plaintiff’s claims for extension of contract performance were in whole or in part denied by defendant’s contracting officer, they were heard and determined in the appeal proceedings before the Corps of Engineers Claims and Appeals Board.
On the basis of detailed findings of fact, supported by substantial evidence in the record of its proceedings, the Board denied the following claims of the plaintiff for further extensions of the contract performance time:
(a) Delay in production of aggregate and preparation of concrete plant allegedly caused by unusually severe weather from February 13 to 29,1952, inclusive: 10 days in addition to the 7 days allowed by the contracting officer in this period on this claim.
(b) Delay in cleanup for first pour in intake structure from March 1 to 5, 1952, allegedly due to excessive raveling of slope and unusually severe weather: 5 days.
(c) Delay from March 9 to April 5, 1952, for scaling allegedly required by excessive raveling of slopes and for additional cleanup operations necessitated by scaling: 17 days in addition to the 11 days allowed by the contracting officer in this period on this claim.
(d) Delay from May 8 to 25, 1952, inclusive, for cleanup of inlet area after slides and for scaling of slope, and on June 10, 23, 24, and 29, 1952, for excessive raveling of slope: 4 days in addition to the 18 days allowed by the contracting officer for the May portion of this period.
61. An additional claim of the plaintiff before the Board was for 4 additional days of extension of the contract performance time allegedly due to additional work on July 14, 15, 19, and 25,1952, in preparation for diversion of the river through the tunnel.
Still another such claim of the plaintiff was for an additional extension of 12 days due to diversion of the river before job completion and for deprivation of use of plaintiff’s high line and power line. The Board reasonably denied the portion of this claim for extension of time relating to deprivation of the high line and power line, but remanded the part concerning diversion of the river, as it *296 did the like claim set forth in the first paragraph of this finding, to the contracting officer.
62. Excepting those of plaintiff’s claims for extension of time remanded as stated in finding 61, the Board reasonably sustained the contracting officer’s findings and decision that plaintiff’s contract performance time was extended 36 calendar days. On the remanded claims, the contracting officer found and decided that plaintiff was entitled to 4 additional days due to diversion of the river through the tunnel, and extended the contract completion date to and including July 22, 1952. The findings and decision allowing these 4 additional days became final as hereinafter related in finding 66.
63. In addition to all of its other claims for extension of time, plaintiff claimed before the Board that it was entitled to 65 days between November 20, 1951, the original bid opening date, and February 2, 1952, the date the executed contract documents were distributed by defendant. On this claim, the Board noted that, although its record did not indicate that such claim had been asserted to or passed on by the contracting officer, it would be considered by the Board as another claim for extension of time to preclude any doubt as to assertion and consideration.
The Board denied this claim, finding and deciding that plaintiff had no vested interest in the contract until notice of award; that both plaintiff and defendant became contractually bound upon delivery of the notice of award, requiring execution of the contract by both parties when it was presented in prescribed form; that notice to proceed on January 8, 1952, was issued in reasonable time; and that plaintiff had no right to commence contract performance prior to receipt of notice to proceed.
The evidence before the Board does not establish that defendant unreasonably extended the bid opening date, unreasonably delayed in awarding the contract, or unreasonably delayed in issuing the notice to proceed, nor does the evidence before this court.
64. On plaintiff’s claim for increased costs and delays resulting from diversion of the river through the tunnel prior to completion of contract performance, the Board reasonably found that the diversion of the river constituted possession *297 and use of plaintiff’s work within the provisions of paragraph GC-10, quoted in finding 17 above, and decided that plaintiff was entitled to equitable adjustment of the contract price and performance time for the delays and added costs •occasioned by the defendant’s order requiring plaintiff to move out of areas reserved for its use prior to completion •of the contract.
65. Plaintiff also presented a claim to the Board for cost ■of repairs, restoration, debris removal, and delays caused by the rock slides occurring on May 8, 1952. The contracting •officer ruled that the rock slides were an act of God entitling plaintiff to extensions of time under Article 5 (c) of the contract, and the 18-calendar-day extension allowed by him as stated in finding 59, for the period from May 9 through May 31,1952, covered the entire period of delay resulting from the rock slides. However, the contracting officer allowed plaintiff reimbursement only for repairs to accepted portions of the low intake structure, and by Modification No. 5, dated July 15, 1952, found such reimbursable cost to be $1,520.42.
The Board found that the rock slides of May 8,1952, were caused by the existence of a subsurface and hidden seam of clay, not indicated in the specifications or shown on the drawings, and that the seam of clay was an unknown physical condition within the meaning of Article 4 of the contract, and plaintiff’s claim in this respect was sustained and remanded to the contracting officer for an equitable adjustment. The Board found that no further extension of contract performance time should be allowed, as the delays resulting from the rock slides were fully covered by the above-mentioned 18-day extension allowed by the contracting officer. The Board ruled that the adjustment for the rock slides should exclude any amounts for scaling performed following the slides, as plaintiff’s claim for such increased costs was disallowed by the Board’s findings and decision thereon, as hereinafter related.
66. By Modification No. 7, dated February 11, 1957, and by subsequent formal findings of fact, defendant’s contracting officer found and decided that the equitable adjustment for increased costs incurred by plaintiff as a result of the rock slides was $14,783.17; and that the equitable adjustment for *298 possession by the defendant of a portion of the work areas prior to completion was $8,404.98, on which latter adjustment plaintiff was allowed the 4-day extension of time, previously mentioned in finding 62.
These findings and decisions of the contracting officer were appealed by the plaintiff to the Board, but plaintiff subsequently withdrew such appeal.
67. It is found that plaintiff’s lack of sufficient plant and equipment and lack of adequate planning, supervision and prosecution of the work caused inexcusable delays in its contract performance at least to the extent of the 29 calendar days for which liquidated damages were administratively assessed.
CLAIM FOR ACCELERATION OE CONTRACT PERFORMANCE
68. Having denied all of plaintiff’s claims for extensions of contract time beyond July 18, 1952, except for the remanded items concerning diversion of the river through the tunnel, the Board correctly stated that the time interval between July 18 and the contract completion date of August 21, 1952, was 34 calendar days; that a further extension of time on the remanded items would not exceed the 16 days claimed by plaintiff; and that plaintiff’s actual performance time would exceed the contract time as finally adjusted. The Board decided that since plaintiff had not completed the work within the time fixed by the contract, as it had been or could be extended, plaintiff’s claims for acceleration were denied.
Based upon consideration of only the testimony and evidence before the Board, it is found that defendant did not require plaintiff to perform the contract in less time than allowed by the contract, as such time was reasonably and properly extended by administrative decision. This same finding is made on all of the evidence before this court.
claim eor raveling of slope
69. Plaintiff further claimed before the Board that it was entitled to increased costs because the conditions of the slope above the intake structure were materially different from *299 those shown on the drawings or indicated in the specifications, and because there were unknown physical conditions of an unusual nature materially differing from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, resulting in excessive raveling, necessitating suspension of contract work for extensive scaling not in contemplation of the contract and causing loss of efficiency, all of which directly increased the cost of performing the contract. Plaintiff’s claims in this respect were divided into two periods of time, that is, before and after the rock slides of May 8, 1952. However, the Board reasonably combined the claims into one and made findings of fact and based its decision on the entire period of the contract performance.
After stating detailed and comprehensive findings of fact, supported by substantial evidence in its record of proceedings,[10] the Board denied this claim by its decision, fully supported by its findings, as follows:
The specifications of the contract require scaling in six different paragraphs as a nonpay, nonproductive principal feature of the work to remove all “loose and fractured rock” from the slopes and work areas for the purpose of maintaining them in a safe condition free from the hazards of rockfall (paragraphs SW-1, TP 1-01, 1-02, 1-08, 1-04, 1-05). By the specifications the scaling was to be done “as necessary” and “as required” for safety.
Since appellant scaled only once without express directions, and began filing claims for excessive raveling and scaling while the second scaling was in progress, it is clear that appellant’s position is that any scaling beyond the first was excessive. In essence, then, its complaint is that it expected to scale only once at the beginning of the job, but the slopes wouldn’t stay scaled. Hence, raveling was excessive. Such a conception of its obliga *300 tions hardly meets the plain provisions of the contract. Moreover, it is contradictory of appellant’s own expectations hereinabove set forth.
The appellant also apparently relies on the opinion expressed in paragraph 1-06 of the Government’s Geologic Report that, “. . . minor raveling can be expected to continue . . .,” as an indication that raveling was expected to be “minor” by the Government as well as appellant. This again is traceable to the insufficient site investigation by appellant to obtain available information. Appellant could have easily ascertained from the excavating contractor, Government personnel present, or from a closer visual examination as one of its consultants later did, that portions of the slopes were composed of fractured, soft, slabby, altered and weathered basalt with a tendency to ravel under erosive weather conditions. To the Government, minor raveling meant minor for rock of such composition after periodic scaling. To appellant, even assuming its prebid expectations were other than professed, it meant minor for a slope of miocene basalt that upon superficial examination looked excellent, flat and clean. This presents more a problem in semantics than an issue of fact, and is particularly unavailing since appellant formed no judgment about raveling based on an opinion of which it was then ignorant.
The Board further finds from all the evidence that raveling is neither a subsurface, latent physical condition nor one of unusual nature differing materially from that normally encountered in work of the character provided in this contract. By appellant’s own definition raveling is surface small rock falling down a cliff by force of gravity. This is certainly not a subsurface, hidden or latent condition totally unexpected by appellant.
. With respect to the contract specifications as written it would be difficult to conceive how the Government could have “indicated in the specifications” more clearly and insistently than it did that scaling was a prime contract obligation. Under such provisions the Board concludes that almost any amount of scaling to prevent raveling, or almost any amount of raveling in the absence of necessary scaling, would be “indicated in the specifications.”
We therefore decide that raveling of the slopes as occurred does not qualify as an Article 4, Changed Condition in any respect, and that this item of claim must be denied.
*301 70. Upon consideration of only the testimony and evidence before the Board, or upon consideration of all of the testimony and evidence before this court, it is found that the Board’s decision and findings are not arbitrary, not capricious, and are reasonable and supported by substantial evidence.
71. It is found from consideration of all of the evidence that defendant did not negligently, carelessly, recklessly or otherwise withhold, conceal, or misrepresent the nature or condition of the rock slope above and about the intake structure area, the raveling that would or might occur, the scaling that might be required, or any other condition or conditions affecting the contract performance.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and the petition is therefore dismissed.

 WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1 (1963), 323 F. 2d 874; Wingate Constr. Co. v. United States, 164 Ct. Cl. 131 (1964); Potter v. United States, 167 Ct. Cl. 28, 37, 38 (1964). See also, Commerce Int’l Co. v. United States, 167 Ct. Cl. 529, 534 (1964) ; National Presto Industries, Inc. v. United States, 167 Ct. Cl. 749, 755, N. 2, 338 F. 2d 299. cert. den. 380 U.S. 962 ; Litchfield Mfg. Corp. v. United States, 167 Ct. Cl. 604, 635 (1964).

 If we were to do that properly, we would have, initially, to resolve a puzzling legal question not determined by tbe Stein Bros, line of decisions, and, then, to make delicate distinctions, founded on our ruling on that question, between the various pieces of de novo evidence. The legal issue flows from our holding in Stein Bros, that, if the Board has not taken evidence on the quantum of recovery, the parties can try that question in this court. Plaintiff chose to introduce such evidence here, and thereby necessarily consented to the defendant’s presentation of countervailing evidence on damages. The difficulty is that defendant did not confine itself to calculations and figures but introduced much evidence to prove that the plaintiff could not have suffered damage from the Government’s acts because the plaintiff’s own performance was so inefficient that it must have caused any loss suffered in the course of the contract work. If we were to review each separate finding to determine what part could rightfully rest on de novo evidence, we would first have to decide how much of the defendant’s case was made admissible by the plaintiff’s voluntary introduction of de novo evidence on damages. Then we would have to apply that ruling to each segment of the defendant’s evidence.

 E.g., Societe Anonyme des Ateliers Brillie Freres v. United States, 160 Ct. Cl. 192, 202 (1963) ; Schmoll v. United States, 105 Ct. Cl. 415, 456, 63 F. Supp. 753, 758, cert. denied, 329 U.S. 724 (1946); Manufacturers’ Casualty Ins. Co. v. United States, 105 Ct. Cl. 342, 351, 63 F. Supp. 759, 760-61 (1946).

 The specifications provided, for instance, that “Scaling shall be performed as required to maintain work areas in a safe condition”, “Scaling shall include the removal of loose rock from all slopes as required to maintain all work area in a safe condition without hazards of rock falls”, and “As necessary for safety, loose or fractured rock shall be scaled and removed from work areas.”

 The “Site Investigation ana Representations” clause of tlie contract (finding 15) placed the risk, generally, on the contractor of ascertaining, from the reasonably available sources, the nature of surface and sub-surface materials. See the discussion infra.

 Plaintiff admits that, shortly after tlie bidding, a Government engineer ■did warn it to expect substantial raveling in the early spring; plaintiff’s representative replied that the engineer was unduly concerned. Rinding 32.

 The rule of Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F. 2d 774 (1963), is obviously inapplicable to information covered by the "Site Investigation and Representations” article. See pp. 443-44, 312 F. 2d at 777-78.

 Since plaintiff did not have this report before it bid, it could not have relied in any way upon the statement as to “minor” raveling. Plaintiff’s present understanding of that passage is irrelevant on this point.

 Tlie original completion date was June 12, 1952. The contracting officer allowed 36 days, extending the date to July 18, 1952. As a result of the Board’s decision, five more days were allowed — to July 23, 1952. Since the work was completed on August 21, 1952, liquidated damages of $300 per day were assessed for 29 days (in the sum of $8,700).

 Among the Board’s well-supported findings, in addition to those reflected in findings 29, 31, 39, 40, and 51, supra, are that (1) plaintiff’s own ■expert testified that a contractor taking due precaution would not rely on visual observation at the site alone and that, from plaintiff’s viewpoint in November 1951, alternate freezing and thawing and heavy rainfall could be •expected to produce raveling but not large rockfalls or slides, and (2) the rock slides on May 8, 1952, were different from raveling, could not have 'been forestalled by scaling, and were attributable to a hidden fault and joint system which was not reasonably discoverable by the contractor and/or >io the defendant’s faulty design of the slope.