**PACIFIC ALASKA CONTRAC-
TORS, INC.**
v.
**The UNITED STATES.**
No. 294–67.

United States Court of Claims.
Jan. 22, 1971.

Stuart G. Oles, Seattle, Wash., attorney of record, for plaintiff. Allen, De-Garmo & Leedy, Seattle, Wash., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM: *

In accordance with the standards for judicial review prescribed by the Wunderlich Act, plaintiff's motion and defendant's cross-motion for summary judgment present issues concerning the finality of a decision of the Department of Commerce Appeals Board, DCAB No. PR–46, 66–1 BCA ¶ 5532, as modified on motion for clarification and reconsideration, 66–2 BCA ¶ 6043.

### I

On October 6, 1959, plaintiff and defendant (by its Bureau of Public Roads, Department of Commerce) entered into contract No. CPR 10–300, by which plaintiff undertook in accordance with defendant's drawings and specifications to perform grading with excavation of cuts and placement of materials in fills, install culverts and provide drainage facilities otherwise, and place overlay material on the accomplished subgrade in the realignment, reconstruction and improvement of 8.7 miles of an existing forest road in Alaska, known as the Hope Highway, located some 80 miles by road from Anchorage.

Basically comprised of agreed unit prices applied to estimated quantities of work and materials, the estimated contract price was $475,002, subject to adjustment to the actual quantities realized in accordance with contract provisions.

The contract provided that performance would be started within 30 calendar days after the date of receipt by plaintiff of defendant's written notice to proceed. Such notice was received by plaintiff on October 30, 1959. The contract allowed 210 calendar days for completion of performance.

Stated in the contract as major items of work were unclassified excavation of an estimated quantity of 216,000 cubic yards of material in the accomplishment of the cuts and fills specified to bring the road to subgrade, and borrow excavation of an estimated 60,000 cubic yards of material for placement of the required overlay on the subgrade.

In the contract performance, plaintiff accomplished and was credited with unclassified excavation in the amount of 181,290 cubic yards, which was about a 16 percent reduction from the 216,000 cubic yards indicated in the contract, not coming within the price adjustments provided by Articles 4.2, 9.3 and 9.5, quoted below. However, plaintiff accomplished and was credited with 144,821 cubic yards of borrow excavation, an overrun of about 141 percent, and the proper basis of compensation for such overrun remains in dispute.

Made part of the contract by express provision are the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP–57, January 1957, promulgated by the Bureau of Roads, Department of Commerce. Articles 4.2, 9.3 and 9.5 thereof provide:

    *     *     *     *     *     *

4.2 Changes. It is mutually agreed that it is inherent in the nature of highway construction that some changes in the plans and specifications may be necessary during the course of construction to adjust them to field conditions and that it is of the essence of the contract to recognize a normal and expected margin of change within the meaning of the clauses "Changes" and "Changed Conditions" in the "General Provisions" of the contract as not requiring or permitting any adjustment of contract prices, provided that any change or changes do not result in (1) an increase or decrease of more than 25 percent in the original contract amount, in the quantity of any major item, or in the length of project, or (2) a substantial change in the

---

* This opinion incorporates the opinion prepared by Trial Commissioner Roald A. Hogenson, with modifications by the court. We reach the same result, in general, as did the commissioner.

character of the work to be performed under a contract pay item or items that materially increases or decreases the cost of its performance.

Any adjustment in compensation because of a change or changes resulting in one or more of the conditions described in (1) and (2) of the foregoing paragraph, except a change in project length by more than 25 percent, shall be made in accordance with the provisions of article 9.3. Any adjustment in contract time because of such change or changes shall be made in accordance with the provisions of article 8.6. Any change in the project length of more than 25 percent or any other change not within the general scope of the contract shall require a supplemental agreement.

\*　\*　\*　\*　\*　\*

9.3 Changes and Altered Quantities. It is mutually agreed, pursuant to article 4.2, that upon demand of either party an equitable adjustment satisfactory to both parties shall be made in the basis of payment if any of the following conditions exist:

(1) The final contract amount or total quantity of a major item involves an increase or decrease of more than 25 percent from the original contract amount or original quantity of the major item, respectively. In the case of an increase, any adjustment in payment shall apply only to the related quantities of work performed in excess of the stated percentage. In the event of a decrease, any adjustment in payment shall apply to the quantity or quantities of work actually performed.

(2) The change ordered by the engineer involves a substantial change in the character of the work to be performed under a contract pay item or items and results in materially increasing or decreasing the cost of its performance.

(3) The engineer orders performance of unforeseen work essential to complete the contract but for which no basis of payment is provided therein.

Agreed prices in any adjustment of payment shall not be more than 15 percent in excess of the cost estimated by the engineer.

The prices agreed upon and any agreed adjustment in contract time shall be incorporated in the written order issued by the engineer, which shall be so written as to indicate acceptance on the part of the contractor as evidenced by his signature.

If prices cannot be agreed upon, the contractor shall proceed with the performance of the work on a force-account basis in accordance with the provisions of article 9.5.

\*　\*　\*　\*　\*　\*

9.5 Force-Account Work. All work performed or labor and materials furnished on a force-account basis shall be paid for on the following basis:

(a) Labor.—For all labor and for foremen in direct charge of the specific operations the contractor shall be paid:

(1) The actual cost of wages paid by him, but at rates not to exceed those for comparable labor currently employed on the project as determined by the engineer.

(2) The actual cost of industrial accident or workmen's compensation insurance.

(3) The actual cost of social security taxes and unemployment compensation insurance.

(4) The actual amounts paid by the contractor by reason of an employment contract generally applicable to his employees.

(5) An amount equal to 15 percent of the actual cost of wages and the other costs listed above.

(b) Materials.—For all materials accepted by the engineer and used in the work, the contractor shall be paid the actual cost of such material, including transportation charges, to which cost shall be added a sum equal to 15 percent thereof.

(c) Tools and equipment.—For any machine power tools and special or

heavy equipment used, the contractor shall be paid reasonable rentals at rates which shall include compensation for fuel and lubricants, which shall be agreed upon in writing before starting work, except when equipment rental rates to be paid are stated in the special provisions. No percentage shall be added to equipment rental rates and no allowance shall be made for the use of small tools and manual equipment.

(d) Supervision.—No allowance shall be made for general superintendence.

(e) Records.—The contractor's representative and the engineer shall compare records of the work performed as ordered on a force-account basis, at the end of each day on which such work is performed. Copies of these records shall be made upon suitable forms provided for this purpose and signed by both the engineer and the contractor's representative, one copy being retained by each party. All claims for work done on a force-account basis shall be certified and submitted to the engineer by the contractor, and such statements shall be filed with the engineer not later than the tenth day of the month following that in which the work was actually performed.

Also included in the contract are the General Provisions of Standard Form 23–A, March 1953, prescribed by the General Services Administration for construction contracts. Thus, the contract contains the standard Changes and Changed Conditions articles, the latter providing for an equitable adjustment of the contract price for—

* * * (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. * * *

Relying on the Changes article and on category (1) of the standard Changed Conditions article, plaintiff claimed, and defendant's contracting officer and the Appeals Board denied, entitlement to an equitable adjustment of the contract price on those theories. Plaintiff believes that the amount of the equitable adjustment under the standard Changes and Changed Conditions articles would under the facts and circumstances of this case exceed amounts allowable under Article 9.5 Force-Account Work, quoted above. No evidence was presented to the Board concerning the amount of such an equitable adjustment because pursuant to an agreement of the parties, determination of the amount of recovery was reserved by the Board for further proceedings in the event the Board decided liability in favor of the plaintiff.

Plaintiff's alternative claim before the Board was that the contracting officer had made insufficient allowances under Article 9.5 Force-Account Work, quoted above, of an increase in the contract price on account of the overrun of borrow excavation.

In this connection, it is noted that the contract unit prices were $0.90 per cubic yard for borrow excavation and $0.36 per yard mile for overhaul (over 1,000 feet) of borrow excavation. Late in the construction season of 1960, at a time when plaintiff had accomplished the excavation, hauling and placement of about 72,000 cubic yards of borrow excavation, the parties agreed that a total of 90,000 cubic yards of such material would be sufficient to complete the contract performance. In accordance with the agreement then reached, Change Order No. 2 was thereafter issued by the contracting officer on November 10, 1960, and accepted by plaintiff on November 15, 1960, by which the parties agreed that plaintiff would excavate, haul and place 30,000 cubic yards of borrow excavation in excess of the estimated contract amount (60,000 cubic yards) at contract unit prices, with the estimated increase in the contract price stated to be $36,360.

After the contract performance was complete, the parties were in dispute as to the computation of the increase in contract price for the overrun of borrow excavation. Since the parties were not otherwise in agreement, the contracting officer employed the Force-Account provisions and determined that the final quantity of borrow excavation incorporated in the project amounted to 144,821 cubic yards (which amount is not in dispute), that no price adjustment was required or permitted for the 90,000 cubic yards placed in conformance with the original contract and Change Order No. 2, and that as to the remaining 54,821 cubic yards, plaintiff was entitled to an overall allowance of $135,308.70, from which were deducted payments previously made to plaintiff of $49,338.90 and $20,125.08 on account of the 54,821 cubic yards, leaving a net sum due plaintiff of $65,844.72.

This price adjustment amounted to an overall rate of $2.10 per cubic yard for the 54,821 cubic yards of borrow excavation and for its overhaul, as contrasted with the contract unit prices of $0.90 and $0.36 paid on the borrow excavation and its overhaul with respect to the first 90,000 cubic yards.

Remission of $10,600 of liquidated damages for delay in contract performance increased the amount due plaintiff to $76,444.72, as determined by the contracting officer. The revised assessment of liquidated damages was in the sum of $2,900, which amount defendant continued to withhold from sums previously paid to plaintiff. Such revised assessment was for an overrun of contract performance time by 29 calendar days, for which no extensions of time were granted.

After the initial decision of the Board, and without direction by the Board, the contracting officer revised his net allowance of $65,844.72 to plaintiff on the grounds that with respect to plaintiff's payments for owner-operated trucks, he had incorrectly applied the 15 percent allowance under Article 9.5(a) (5), quoted above, to the total paid for owner-operated equipment rather than the part representing the time (or wages) of the owner-operator. This revision amounted to a net reduction of $1,216.14, or a reduction of the previous net allowance to the sum of $64,628.58, which resulted in a revised determination of the contracting officer, that plaintiff was due the sum of $75,228.58, including the previously allowed remission of liquidated damages. Defendant then made payment of the sum of $75,228.58 to plaintiff, which was made and received without prejudice to the rights of either plaintiff or defendant arising under the subject case before the Appeals Board. Thereafter the Board modified its initial decision on motion for clarification and reconsideration, but not with respect to the above-stated revision of the Force-Account determination of the contracting officer, as that matter was not addressed to the Board.

The contract performance time began to run on October 31, 1959. On that date, and as anticipated by the parties, defendant suspended all work except for clearing and grubbing because of commencement of unsuitable weather. Such shutdowns were authorized by contract provisions. As was known by both parties, general road construction work is not reasonably possible in Alaska except during the period from about mid-May to mid-October of each calendar year. Plaintiff commenced clearing and grubbing on November 2, 1959, and continued until the close of work on February 26, 1960, when severe winter weather necessitated shutdown of all work. Because only a small work force could be maintained during that time, plaintiff was charged with only 15 days of contract performance time.

Plaintiff's performance recommenced on May 18, 1960, pursuant to a directive of defendant, issued May 2, 1960. Work continued throughout the season until winter weather conditions caused a shutdown on November 10, 1960. Seventy-five percent of the work had been accomplished in 91 percent of contract time.

Work resumed June 5, 1961, as ordered, and a shutdown was ordered from June 19 through June 25, 1961, because of unsuitable weather. Work again resumed on June 26, but was immediately stopped by a labor strike which lasted until July 14, 1961. Thereafter, except for brief stoppages, work continued until a winter shutdown was ordered on October 23, 1961. Contract performance was then 95 percent complete, and 125 percent of the contract performance time had elapsed.

Work resumed on June 4, 1962, as ordered, and continued without interruption until the project was accepted for use on September 21, 1962. No charge was made for contract time between that date and the completion of minor cleanup on October 5, 1962, at which time the project was formally accepted.

The contract performance required a total of 420 calendar days to complete, and the contract performance time of 210 calendar days was extended 15 days by Change Order No. 2, mentioned above, 24 days because of the labor strike, 36 days allowed on an estimated payment because of a 17 percent overrun in contract amount at that time, 29 days on account of the contracting officer's allowance of the net amount of $65,844.72 for overrun of borrow excavation, and 77 days for a variety of problems encountered with respect to borrow pit operations, leaving 29 calendar days of delay in contract performance, for which liquidated damages were assessed, as previously stated.

The uncontradicted engineering testimony before the Board clearly establishes that the overrun of borrow excavation resulted from a combination of the following factors: (1) A major grade change was ordered by defendant during contract performance between stations 36 + 00 and 129 + 00, which heightened the subgrade, reduced the amounts of fill material expected to be obtained in the unclassified excavation to be used in accomplishing the fills, and increased the amounts of embankment materials required for the fills over that estimated in the contract drawings; (2) slopes of rock cuts were steepened, as ordered by defendant, with a substantial reduction in the volume of rock available as part of the unclassified excavation for placement in the embankment as contemplated; (3) in the preparation of its contract drawings and bid information, as revealed by its design records which were not included in the contract documents, defendant used a swell factor for rock of 25 percent, using the established principle that rock excavated from its natural location occupies substantially more space when deposited in a fill, even after compaction, and with the circumstances clearly established that in this case there was very little, if any, swell in the rock excavated and used in the embankments, due to the fact that the rock encountered was slate and shale, with cracks and voids in its natural state, and which broke up into much finer materials than expected; and (4) that most of the common materials (other than rock and waste materials in the unclassified excavation) proved to be unsuitable as fill material, and that most of the estimated 56,800 cubic yards of such material had to be wasted, contrary to expectations. Each of these factors was of substantial magnitude and together caused an overrun of borrow excavation of 84,821 cubic yards, necessary to supply the deficiency of the fill materials to bring the subject road to subgrade, and over and above the 60,000 cubic yards of borrow material necessary to provide the specified overlay of materials.

Also included in the above-mentioned FP-57 standard specifications for road construction were the provisions of Article 6.1 Furnishing Material; Material Sources; Designated and Listed Sources; paragraph (b) of which states:

(b) Pit and quarry sources.—All pit and quarry sources of material shall be approved by the engineer before any material to be incorporated in the work is removed therefrom. The Government may identify on the plans

or in the special provisions "designated sources" or "listed sources" from which the contractor may obtain the material. If any royalty charges are involved for material removed from either designated or listed sources they will be set forth in the special provisions and shall be paid by the contractor. At the election of the contractor, however, he may obtain the material from other sources provided (1) the material therefrom meets specification requirements and (2) the contractor assumes all responsibility and expenses in connection with obtaining the material therefrom and accepts payment therefor at the applicable contract unit price or prices.

Seven borrow pit locations were shown on the contract drawings, spaced along either side of the roadway, and the following schedule sets forth the information on the contract drawings as to each of such pits, their locations being designated both by stated mileage points and surveying stations of the project, together with the acreage of each pit site, and the contract estimated quantity in cubic yards of borrow excavation expected to be removed from each pit. The last column of the schedule shows the actual amount of borrow excavation in cubic yards obtained from each pit and credited to plaintiff in the contract performance.

| Mile Point | Station | Acreage | Contract Estimate c.y. | Cubic Yards Obtained |
|---|---|---|---|---|
| 0.1 .... | 10 + 40 | 0.12 | 3,600 | 2,871 |
| 1.4 .... | 77 + 60 | 0.41 | 6,600 | (none) |
| 2.6 .... | 141 + 20 | 0.63 | 10,100 | 20,796 |
| 4.5 .... | 242 + 00 | 0.67 | 10,900 | 7,452 |
| 6.4 .... | 346 + 80 | 0.58 | 9,300 | 4,800 |
| 7.2 .... | 383 + 25 | 0.40 | 6,400 | 23,569 |
| 8.3 .... | 445 + 80 | 0.32 | 5,200 | (none) |
| Totals .............. | | | 52,100 | 59,488 |

The pits at mile points 2.6 and 7.2 each had two extensions of the original site. Pit mile 1.4 had poor materials not useable for embankment fills or overlay. Pit mile 8.3 was deleted in the winter of 1959 because the Bureau of Roads could not obtain permission from another Government agency for its use.

Plaintiff obtained the balance of the accomplished and credited borrow excavation (over and above that removed from the borrow pits designated on the contract drawings) from new pit locations, not mentioned in the contract documents, with their locations shown with respect to project surveying stations, in close proximity to the roadway, and with the credited quantities of borrow excavation removed therefrom, as follows:

| Station | Cubic Yards |
|---|---|
| (See below) ...................... | 10,743 |
| 75 + 00 ......................... | 8,161 |
| 75 + 00 ......................... | 18,284 |
| 122 + 50 ......................... | 5,028 |
| 347 + 00 ......................... | 18,707 |
| 347 + 00 ......................... | 23,801 |
| 451–454 ......................... | 609 |
| Total ...................... | 85,333 |

The first of these pits was located about 350 feet before the commencement of the project; the second about 700 feet left of the roadway, near but somewhat removed from pit mile 1.4 shown on the contract drawings; the third near but separate from pit mile 1.4; the fourth about 450 feet to the right of the roadway; the fifth and sixth about 500 feet to the left of the roadway, with one being extensions of the other; and the seventh located alongside the roadway.

II

The contract documents did not contain any express statement that the project was designed as balanced within each of its successive segments for the excavation and placement of materials. While the engineering testimony before the Board was uncontradicted that the project was designed as a balanced project, it is obvious that such testimony was based primarily upon consideration of defendant's internal design records prepared and considered in connection with the production of the contract drawings, which design records were not mentioned at all in the contract documents.

The engineering witnesses pointed out on the drawings arrows indicating the successive balance points on the draw-

ings, and also relied upon the breakdown on the contract drawings of the overall estimated amounts of unclassified excavation and borrow excavation within the successive balance points as confirming that the design records showed that subject project was designed by defendant as a balanced project, i. e., that within each segment of the project, excavation of cuts would supply sufficient useable materials for use in the fills to raise the embarkment to subgrade, and that sufficient overlay material would be obtained from a nearby pit or pits.

The design records also showed that defendant allowed for a 25 percent swell factor in rock excavation in considering the availability of sufficient useable materials from rock excavation to provide part of the unclassified excavation to be placed in fills, but the contract documents contain no statement or reference to the rock swell factor.

■ While express representations as to the nature of conditions to be encountered in contract performance are not essential to the establishment of entitlement to an equitable adjustment for changed conditions under the standard Changed Conditions article, at least insofar as subsurface or latent conditions are concerned, there must be reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance, or to view the other side of the coin, that there were such indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered. United Contractors v. United States, 368 F.2d 585, 595–597, 177 Ct.Cl. 151, 161–164 (1966); Foster Construction C. A. and Williams Brothers Co. v. United States, Ct.Cl., 435 F.2d 873, decided December 11, 1970.

■ We hold that there were no such changed conditions within this meaning of the standard article. In the first place, no claim is, or could be, made that the listed borrow pits failed. As shown above, they did not fail. The drawings indicated that these pits would provide an estimated 52,100 cubic yards of borrow excavation, and in fact they supplied 59,448 cubic yards. Also, the failure of the listed pits located at mile posts 1.4 and 8.3 were remedied by the location and approval of the highly productive pits very near to pit mile 1.4 and of those located at station 347 + 00, relatively close to pit mile 8.3 at station 445 + 80. Plaintiff could not reasonably rely, especially in view of Article 6.1(d), on the precise accuracy of the locations and productiveness of the listed borrow pits, and in this case the differences (with respect to the pits) between the contract indications and the actual conditions encountered were not substantial or significant. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968), was quite a different case since, in that instance, there were very material differences in the usefulness of the borrow pits as compared to the indications in the contract documents (for example, there was significant failure in 65 percent of the designated pits). See 397 F.2d at 834–835, 184 Ct.Cl. at 674–675.

Nor was there any indication in the contract documents as to a "swell factor". As we have pointed out, that element was in fact evaluated in the defendant's internal consideration of the project, but it was not at all indicated, in any proper sense of that term, in the papers handed to plaintiff before and at the time of the consummation of the contract. There was no data contained in the bid information documents, either in the contract drawings or otherwise, that defendant had by drilling or otherwise made any subsurface investigation of the nature and extent of the useable materials involved in the unclassified excavation in the roadway or in the borrow pits.

What plaintiff mainly relies upon is the claim that the contract documents did affirmatively indicate that the project was a balanced one, so that the amount of material "cut" would balance,

for each designated sector of the work, the amount to be used for "fill". In this respect, the contractor's brief agrees that the drawings and specifications nowhere "expressly represent that the job is balanced after computation of shrink and swell factors. It is instead our contention that read as a whole an engineer or contractor would conclude reasonably and necessarily that the job was designed to be balanced, and that no borrow would be required for embankment." As suggested *supra*, we can assume that, in their within-the-government calculations, defendant's agents intended or hoped the job would be a balanced one, but we cannot find that they overtly reflected that purpose in the contract papers by way of any sufficient "indications", upon which the contractor could rightly rely, of subsurface or latent physical conditions. The two things on the drawings to which plaintiff points—the arrows marking the segments and the breakdown, for each segment, of the total estimated amounts of unclassified and borrow excavation— are more realistically seen as hopes, expectations, guesses, or suggestions than as firm indications that subsurface or latent conditions were such that balance would actually be achieved.[1] The frequent reminders throughout the specifications that the estimated figures must be viewed with great caution should have warned plaintiff against drawing any serious inferences, from these bare and rough estimates, as to the "balanced" character of the job and therefore as to the physical nature of the underlying conditions. We think, in short, that in these respects the contract documents were substantially silent, and that plaintiff should have so recognized. See United Contrac-

tors v. United States, *supra*, 368 F.2d at 595, 177 Ct.Cl. at 161.

■ As to plaintiff's claim of entitlement to recovery on the theory of breach of warranty of design, not presented to the Board in connection with any claim for an equitable adjustment, nor even mentioned in plaintiff's original or amended petition filed herein, but first advanced in brief passages of its opening brief in support of its motion for summary judgment, it is held (for the reasons just given) that the facts and circumstances of this case do not justify an extension of the principle reaffirmed in Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963), and J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct. Cl. 70 (1965), to the effect that the Government is deemed to warrant the adequacy of its specifications to the extent that compliance therewith will result in satisfactory performance of the contract. *Cf.* Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622 (1877); Brock v. United States, 84 Ct.Cl. 453 (1937); Everett Plywood & Door Corp. v. United States, 419 F.2d 425, 190 Ct.Cl. 80 (1969).

We need not consider any separate claim under the Changes article, independent of the contention of changed subsurface conditions, because plaintiff has made no such claim either before the Board or in this court. All the contractor's arguments, under the Changes as well as the Changed Conditions clauses, rest upon the basic assertion that subsurface conditions actually encountered differed from those indicated in the contract documents and anticipated by the plaintiff.[2] Since we have determined

---

1. The defendant points out that the drawings figures for "cut" jibe only very roughly with those for "fill".

2. In its original opinion the Board said: "It was agreed by the parties that we should undertake to determine only whether 'changed conditions' within the meaning of the pertinent contract provisions had been encountered, and, if so, that the claim would be remanded to

the Contracting Officer for determination of the proper amount thereof." The concluding paragraph of the amended petition in this court states (in part): "Plaintiff is entitled to a finding of changed conditions and to an equitable adjustment of not less than $300,000.00 over what has heretofore been paid, for changes and changed conditions. If the Court finds there was no changed condition, plaintiff is yet entitled to an ad-

that there were no such changed conditions, there is no independent claim under the Changes article left to consider.

For these reasons, it is our conclusion that the contracting officer and the Appeals Board correctly denied plaintiff's claim of entitlement to an equitable adjustment under the standard Changes and Changed Conditions articles of the contract, without resort to Articles 4.2, 9.3, and 9.5.

### III

The contract provided in Article 4.2, quoted above, that any adjustment in compensation because of changes resulting from an increase of more than 25 percent "in the quantity of any major item" "shall be made in accordance with the provisions of Article 9.3." In turn, Article 9.3 ("Changes and Altered Quantities"), *supra*, declared, first, that in this class of case "any [upward] adjustment in payment shall apply only to the related quantities of work performed in excess of the stated percentage [*i. e.* 25 percent]," and, second, that if the new prices could not be mutually agreed upon the provisions of Article 9.5 ("Force-Account Work"), *supra*, should apply. Article 9.5, in its turn, sets out a formula for work to be compensated on the force-account basis, which results, in general, in awarding the contractor his labor and material costs (including transportation charges) for the excess work, plus 15 percent, as well as reasonable rentals for power tools and equipment—but no allowance for general superintendence.

These provisions, taken together, apply in terms to this case because the amount of extra borrow excavation—a "major item" of this contract—exceeded 25 percent of the expected borrow excavation (the overrun, as stated above, was about 141 percent). Since, as we have determined in Part II, *supra*, there was no changed condition invoking the Changed

Conditions clause (or the Changes article), there can be no argument against application of these provisions of Articles 4.2, 9.3, and 9.5, and we do not have to reach the issue of whether the rule of Morrison-Knudsen Co. v. United States, *supra*, 397 F.2d 826, 184 Ct.Cl. 661 (1968), would preclude resort to these clauses if there had been a changed condition within the standard Changed Conditions article.

With respect to plaintiff's Force-Account claim before the Board, the Board made determinations with respect to the validity or lack of validity of the contracting officer's allowances to plaintiff only in five respects. In fact, plaintiff presented no testimony or evidence to the Board concerning failure on the part of the contracting officer to allow or sufficiently allow items properly to be included under the provisions of the Force-Account article, but rested its case (with four exceptions) on its assertion that it was entitled to recover its total costs experienced on the overrun of borrow excavation, not limited to the reasonable and necessary costs experienced. The four exceptions were that in its posthearing brief, plaintiff challenged the contracting officer's treatment of four items, i. e., those relating to owner-operated equipment, down time of equipment for repairs, slope finishing and clean up costs, and payment of overhaul, on which the Board's rulings are related below.

First, however, it is noted that in its original decision, as to a part not subsequently modified, the Board held that the contracting officer was correct in treating the contractor's claim in accordance with the contract specifications applicable to changes and altered quantities and allowing compensation on a Force-Account basis,

> \* \* \* except that in our judgment, the Contractor's entitlement to extra compensation should be comput-

---

justment of 'force account' under the 'overrun-underrun' provision of the contract in a sum of not less than $150,-

000.00, over what has heretofore been paid."

ed without regard to the change order which increased the quantities of borrow material from 60,000 to 90,000 cubic yards, to be moved at the contract unit prices. That is to say, compensation on a force-account basis should be allowed in respect to the cubic yardage moved above 75,000, i. e., 25 percent above the bid schedule quantity of 60,000 cubic yards.

After discussing the principle of accord and satisfaction as applied to a negotiated change order, and the voidability of such an agreement for mutual mistake of fact, and after stating in detail the facts relating to the circumstances under which the parties entered into the agreement embodied in Change Order No. 2, mentioned above, the Board held *sua sponte* that such change order was rescinded, and that the case was remanded to the contracting officer to determine from appropriate records pertaining to the borrow work and in accordance with established auditing methods under the provisions of Article 9.5, the contractor's entitlement to extra compensation for the borrow overrun without regard to the payment terms of Change Order No. 2, and in connection therewith, an appropriate extension of contract performance time.

It is clear that the Board's ruling as to Change Order No. 2 was correct as a matter of law, applying established principles of law for rescission of an agreement on account of a mutual mistake of fact, and that its decision in this respect was supported by more than substantial evidence in the administrative record.

In its original decision, as to a part not subsequently modified, the Board sustained plaintiff's position and held that the contracting officer erred in his force-account determination in allowing plaintiff only the amount actually paid to equipment owners for rental of equipment, and held that plaintiff was entitled to the greater amount provided by the rental rates specified in the contract.

In its original decision, the Board sustained plaintiff's position and stated that

while ordinarily in computing force-account awards, no allowance is made for so-called "down time" of equipment, in the special circumstances of this case, with a large overrun of borrow excavation and consequent extraordinary wear and tear of equipment, it would be equitable and proper to make a reasonable allowance on this account. However, on the showing made by defendant in the clarification and reconsideration proceedings, the Board modified its decision and held that the contracting officer's force-account determination did actually include, among other items, an allowance for such down time, and concluded that no additional allowance should be made for down time on that item. The Board reconfirmed its original determination of no changed conditions.

On the two remaining items of the contracting officer's force-account determination, disputed by plaintiff in its post-hearing brief, the Board in its original decision rejected plaintiff's objections that certain deductions were erroneously made in respect to slope finishing and clean up costs, and in respect to the payment of overhaul, on the grounds that the latter deduction was necessary to avoid a duplicated payment for the same item as part of the contractor's charge for overhaul as well as part of his proposed charge for force-account, and the former deduction was made because the work involved was a subsidiary obligation of the contractor under other items for which he was already paid. These rulings were not subsequently modified by the Board.

The Board concluded its decision on motion for clarification and reconsideration by stating:

Regarding the matter of alleged errors and arbitrary deductions made in the Contracting Officer's force-account computations, it would ordinarily be appropriate to require an audit of the items involved by the Bureau's field organization. However, in view of the poor personal relations between the immediate parties that developed during contract operations and have evi-

dently worsened in the subsequent proceedings, we should be glad, if agreeable to the Contractor, to have these matters looked into by appropriate Washington-based Bureau personnel.

By letter to plaintiff's attorney of record, dated January 30, 1967, the Chairman of the Department of Commerce Appeals Board stated with respect to subject case as follows:

This is to confirm our telephone conversation of last Thursday, January 27, 1967, relating to the possibility of a further review of certain of the Contracting Officer's force-account determinations in the above-entitled case.

The Bureau's audit staff advises that such a review would necessarily entail reconsideration of all force-account and related determinations and require consultation with the field staff involved to the extent available records were incomplete or otherwise inconclusive. I understand that you would prefer in these circumstances to request an independent review by the General Accounting Office of the alleged erroneous determinations. You are, of course, free to do so and for this purpose you may treat our earlier decisions and this letter as constituting the close of administrative consideration of the Contractor's appeal.

In spite of the statement made in the last sentence of this letter, it is obvious that further proceedings are necessary on the level of the contracting officer to implement the original decision of the Board, as modified on motion for clarification and reconsideration, and that any such action by the contracting officer would be subject to review by the Board.

It is our opinion that this court should not entertain a piecemeal review of the administrative decisions with respect to the force-account determinations, but should await a final determination administratively of all issues relating to that subject matter. In its opening brief, plaintiff advised this court that in its view all of the Board's rulings on the force-account phase of this case should be disregarded, because there was not sufficient evidence on the subject before the Board, the question of accounting having been reserved. The administrative record is highly confused on this matter, and this provides another reason for the court to defer consideration of force-account issues until there has been a final administrative determination of all questions involved in that subject matter. Except for the relatively precise adjustment relating to Change Order No. 2, there is a lack of specificity and definition as to the still-disputed force-account issues, both in the administrative record and in the briefs filed in this court.

Aside from Change Order No. 2, discussed *supra*, we do not now decide any of the issues of amount or quantum relating to the proper computation under the force-account formula. Those questions, including the quantum issues already decided by the Board, are all left open for possible court review if the case should come here again. Meanwhile, the proceedings here will be suspended under Rule 167 for a period of six months to allow the parties to obtain further administrative consideration of these issues of amount under the force-account provisions.

## CONCLUSION

The court concludes as a matter of law that the Department of Commerce Appeals Board correctly held that plaintiff is not entitled to an equitable adjustment of the contract price under the standard Changes and Changed Conditions articles of the contract; that the plaintiff is not entitled to recover on its theory of breach of warranty of design; that plaintiff's motion for summary judgment is denied insofar as it concerns the two foregoing claims, and further proceedings on it are suspended insofar as it concerns plaintiff's claim under the force-account provisions of the contract; that defendant's cross-motion for summary judgment is allowed, except for defendant's claim that the Board erred in its decision with respect to rescission of Change Order No. 2

of subject contract, as to which issue defendant's cross-motion is denied, and except as to matters concerning the amount due under the force-account provisions, as to which further proceedings are suspended; and that further proceedings in this court are suspended under Rule 167 for a period of six months to allow the parties to obtain further administrative consideration of the issues of quantum or amount under the force-account provisions of the contract.