**A.S. McGAUGHAN COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 390–89C.

United States Claims Court.

Dec. 17, 1991.

Andrew F. Dempsey, Jr., Washington, D.C., for plaintiff. Morley Caskin, of counsel.

Scott E. Ray, Washington, D.C., with whom was Asst. Atty. Gen. Stuart E. Gerson, for defendant. David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on defendant's motion for summary judgment. Plaintiff contracted with the United States to construct an addition to Abert Hall at the Defense Mapping Agency in Brookmont, Maryland. Plaintiff seeks compensation on behalf of its subcontractor for expenses incurred on encountering unexpected site conditions. In response, defendant filed a motion for summary judgment, alleging that the site conditions actually encountered were indicated in the contract and contract-related documents. Plaintiff opposes the motion on the grounds that genuine issues of material fact remain and that defendant is not entitled to judgment as a matter of law.

### Factual Background

On June 6, 1986, the United States Army Corps of Engineers (Corps) awarded plaintiff, McGaughan Construction Company, a $17,745,000.00 contract for the construction of the Abert Hall addition, which was to be built over a ravine. Although the structure was to be supported primarily by caissons, the basement slabs were to rest on the natural soils and structural fill. This design required plaintiff to excavate into the hillside while placing structural fill in the ravine up to the level of excavation. Plaintiff subcontracted this part of the Abert Hall addition project to Dewey East Excavating Company, Inc. (DEECI).

The contract placed the responsibility for determining site conditions on the contractor. In provision I.45, the contract stated:

The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its costs, including but not limited to

* * * (4) *the conformation and conditions of the ground* * * *. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and *subsurface* materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, *including all exploratory work done by the Government,* as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the government. [Emphasis added.]

In section 1D, paragraph 2.1, the contract referenced physical data furnished for information only:

*Explorations:* The physical conditions indicated on the drawings and in the specifications are the result of site investigations by core borings. Foundation exploration logs are shown on drawings. *Whenever subsurface exploration logs are presented in the contract documents, soil test results are available for inspection* in the Baltimore District, Corps of Engineers, Foundation and Materials Branch, Room 204, Fallon Federal Building, 31 Hopkins Plaza, Baltimore, Maryland. *Soils and rock samples are also available for inspection;* however, advance notice of at least 24 hours must be given so these samples can be made available. [Emphasis added.]

Since the structural fill had the potential to settle below the excavation level, defendant included in the contract numerous technical provisions designed to prevent such differential settlement. Among these provisions was technical section 2N, paragraph 2.1.1, which defined satisfactory fill materials:

Satisfactory Fill Materials: Structural fill, embankment and backfill within the building lines of structures, storm water

management basis, beneath appurtenant structures, and beneath abutting paved areas shall be those materials classified in MIL–STD–619B as GW, GP, GM, GC, SW, SM, SC, or combinations thereof, properly worked by the Contractor to obtain optimum moisture and the specified compaction *except that not more than 80 and 30 percent by weight of the material shall pass the No. 4 sieve and the No. 200 sieve, respectively.* [Emphasis added.]

Technical section 2N, paragraph 6, required fill to be compacted to 95 percent of maximum density, according to modified proctor standard CE 55.

In addition, various drawings and boring logs were attached to the contract. The boring logs revealed the soil as predominately brown and gray micaceous, silty sand. According to Military Standards (MIL–STD) 619B, this soil is classified as "SM." The boring logs also revealed the presence of clay, gravel, rock, and roots in the SM soil.[1] The boring samples were available for inspection with 24 hours notice at the Corps' offices in Baltimore, Maryland.

In addition to compiling boring logs, defendant performed a sieve analysis of each boring sample. From these analyses, defendant prepared gradation curves.[2] These gradation curves indicated that the on-site SM soil failed to meet the gradation requirements in technical section 2N, paragraph 2.1.1. Although the sieve analyses and gradation curves were not included in the contract documents, they were available for inspection at the Corps' offices in Baltimore, Maryland.

Prior to bidding, another set of boring logs was compiled by Geotech, Inc., an engineering firm specializing in soils and foundation. Geotech prepared the logs for Ballinger Company, the architectural and engineering firm for the Abert Hall addition project. In preparing its logs, Geotech used the same boring samples that defendant had used in preparing the boring logs included in the contract documents.

The Geotech logs revealed the soil as predominately brown and gray micaceous, silty sand. These logs also revealed roots, twigs, wood, leaves, and other decayed matter, as well as clay, gravel, and rocks.[3] The logs further referred to "fill" or "possible fill."[4] Defendant did not include the Geotech logs in the contract documents provided bidders.

In addition to compiling boring logs, Geotech prepared a soils report. In this report, Geotech recommended that clean granular soils, such as well graded sand or sand and gravel, be used as structural fill. Geotech noted that the on-site material could also be used for compacted fill. Because of the on-site material's composition, Geotech recommended that any fill operation involving the on-site material be closely monitored, preferably by a soils engineer.

Defendant maintains that it purposely excluded the Geotech report from the contract documents provided bidders. According to defendant, it disagreed with some of Geotech's recommendations and did not want to mislead bidders by including the report in the contract documents.

Prior to bidding, plaintiff reviewed the contract documents, including the boring logs and contract drawings. Plaintiff also

---

1. Of the 25 boring logs included in the contract, 14 indicate the presence of roots. Of the 16 boring logs corresponding to boring samples from within the Abert Hall addition site, 11 indicate the presence of roots. In each boring sample, the roots were found within the first 5 feet of earth.

2. A sieve analysis is performed to determine the particle size distribution of soil and other materials. It is performed by running the material through screens whose grids vary in size from very coarse to very fine. For each screen, the percentage of the material passing through the screen's grid is recorded, as is the percentage retained. A gradation curve is a graphic representation of a sieve analysis.

3. Twelve of 22 boring logs prepared by Geotech indicate the presence of roots, and to a lesser degree, twigs (7 times), wood (3 times), leaves (once), and decayed matter (twice). Because of the way Geotech prepared the boring logs, it is difficult to determine at what depth Geotech encountered the organic materials.

4. Seven logs refer to "possible fill"; five logs refer to "fill."

inspected the site. Plaintiff did not inspect the soil test results available at the Corps' Baltimore office; nor did it perform its own soil tests. Thus, plaintiff did not review any sieve analyses or gradation curves before submitting its bid. On June 18, 1986, plaintiff received a Notice to Proceed and a short while later began work.

The parties first discussed the gradation requirements before plaintiff began placing structural fill. Plaintiff had received a soils report of August 22, 1986, from its consultant, Hanna Laboratories (Hanna). In the report, Hanna explained that the on-site material failed to meet the gradation requirements but, nevertheless, concluded that the on-site material could be used as structural fill. On receiving the report, plaintiff notified defendant by letter of its intention to use the on-site material in constructing structural fill.

Shortly thereafter, plaintiff began placing the on-site material as structural fill. Defendant verbally ordered plaintiff to cease its fill operations, but plaintiff responded that it would continue the operations until it received a written stop work order. As a result, on September 11, 1986, defendant issued a notice of deficiency and stop work order, explaining that the on-site material failed to meet the section 2N, paragraph 2.1.1, gradation requirements. Defendant further directed plaintiff to remove the on-site material already placed and to comply with the structural fill requirements. On September 22, 1986, plaintiff provided defendant a "Notice of a Claim" for additional work resulting from defendant's directives.

In a meeting with defendant held March 11, 1987, plaintiff aired its concerns about the subsurface conditions at the Abert Hall addition site. However, according to the minutes of the meeting, plaintiff and defendant did not address the gradation requirements of section 2N, paragraph 2.1.1. Instead, plaintiff's concerns centered on the amount of perched water and deleterious material, such as roots, wood, stumps, debris, and top soil, encountered in the subgrade. Plaintiff also feared that the differ-

ences in densities between the undisturbed soil and the fill would result in differential settlement. As a result of encountering these conditions, plaintiff had virtually shut down the Abert Hall addition.

As a result of this meeting, defendant issued a change order ("Change AR") on April 17, 1987, which corrected the defects in the foundation design by replacing the floating slab on grade design with a suspended slab founded on 36-inch caissons. By letter of December 17, 1987, plaintiff submitted a claim for an equitable adjustment of $3,415,746.00 to the contracting officer (CO). Plaintiff's claim was based on Change AR and included additional claims seeking compensation of $303,266.00 on behalf of DEECI. However, the parties agreed that the claims submitted on DEECI's behalf would receive separate consideration as the majority of those claims were not related to Change AR.

Consequently, plaintiff submitted a separate claim for an equitable adjustment on DEECI's behalf to the CO. By decision of April 10, 1989, the CO denied the claims related to the rejection of the on-site material for use as structural fill. The CO, however, indicated that the claims related to Change AR may have merit.[5]

On July 12, 1989, plaintiff timely filed in this court a direct access appeal from the CO's final decision under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a)(1). In its complaint plaintiff seeks an equitable adjustment of $364,000.00. Since the filing of the complaint, however, plaintiff has settled those claims relating to Change AR. Thus, the only issue presently before the court concerns expenses plaintiff incurred when defendant rejected the on-site material for use as structural fill.

Plaintiff seeks relief both on and off the contract. On the contract, plaintiff seeks an equitable adjustment based on the Differing Site Conditions clause of the contract. Off the contract, plaintiff proffers two breach of contract theories. First, plaintiff claims that defendant breached its

---

**5.** The compensation sought in these claims totaled $37,271.00.

duty to disclose superior knowledge about the site conditions. In addition, plaintiff claims defendant misrepresented the site conditions.

Defendant filed its motion for summary judgment on December 6, 1990. Defendant maintains that the site conditions encountered during performance did not materially differ from those indicated in the contract documents and bidding information. Defendant further alleges that it disclosed all relevant information and did not misrepresent the site conditions. Upon plaintiff's request, the court heard oral argument on September 21, 1991.

### Summary Judgment

Summary judgment is an integral part of the federal rules; it is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (*quoting* Fed. R.Civ.P. 1). Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RUSCC 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp.* 477 U.S. at 324, 106 S.Ct. at 2553. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs.

*H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

To grant summary judgment in the present case, the court must determine, as a matter of law, whether the contract and contract related-documents revealed the true nature of the subsurface conditions at the Abert Hall addition site. The court is presented with questions of contract interpretation.[6] The court may rule on those interpretations as a matter of law. *P.J. Maffei Bldg. Wrecking v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984); *National Rural Utils. Coop. Finance Corp. v. United States*, 14 Cl.Ct. 130 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989).

### Discussion

#### A. Differing Site Conditions

■ The contract between defendant and plaintiff contained the standard Differing Site Conditions clause. Plaintiff advances a Type I differing site condition claim. As a threshold matter, plaintiff must demonstrate that the conditions encountered during performance differed materially from the conditions "indicated" in the contract.[7] *Maffei Bldg. Wrecking Corp.*, 732 F.2d at 916. Determining what the contract "indicated" is a matter of contract interpretation and thus presents a question of law for the court. *Id.*

■ "A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *Maffei*, 732 F.2d at 916. These contract "indications" need not be express. *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 593, 435 F.2d 873, 875 (1970); *e.g.*, *CCM Corp. v. United States*, 20 Cl.Ct. 649, 656 (1990). Neverthe-

---

**6.** At oral argument, plaintiff for the first time alleged that the sieve analyses and gradation curves might not have been available for inspection at the United States Army Corps of Engineers (Corps) offices in Baltimore, Maryland. Plaintiff, however, has not produced any evidence to support its allegation.

**7.** A Type II differing site condition consists of unknown and unusual physical conditions at the site that differ materially from those ordinarily encountered in performing similar contractual work. *Foster Constr. Co. v. United States*, 193 Ct.Cl. 587, 594–95, 435 F.2d 873, 876 (1970).

less, the bid information or contract documents must contain "reasonably plain or positive indications" that subsurface conditions would be more favorable than those encountered. *Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 863–64, 436 F.2d 461, 469 (1971).

■ The contractor must show that it reasonably relied on the contract and contract-related documents. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed.Cir.1987). Moreover, "[t]he conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding." *Id.*

■ In this case, defendant rejected the on-site material for use as structural fill as it failed to meet the gradation requirements of contract technical section 2N, paragraph 2.1.1. Plaintiff, however, claims that the contract indicated the on-site material was suitable for use as structural fill. Plaintiff points to the project design of the Abert Hall addition as indicating the on-site material was suitable for use as structural fill. According to plaintiff, the site was balanced between "cuts" and "fills" so that the amount of material to be excavated approximated the amount needed for fill. The design also called for on-site material to support the slab on grade in the excavated areas. Finally, caissons, not fill, were to bear most of the weight of the addition. Based on these design features, plaintiff concluded that the designers intended for the on-site material to be used as structural fill.

In *Pacific Alaska Contractors*, the court entertained a similar argument. In that case, the contractor encountered an unbalanced project and consequently incurred unanticipated expenses obtaining borrow. According to the contractor, although the contract drawings and specifications nowhere expressly represented that the job was balanced, these documents read as whole indicated the job was balanced. *Pacific Alaska Contractors*, 193 Ct.Cl. at 865, 436 F.2d at 469–70. The contractor placed particular reliance on the contract drawings, which contained arrows marking balance points between segments of cut and fill and a breakdown of the estimated amount of material within each segment. As the total estimated amounts of cut and fill roughly coincided, the contractor concluded that the contract documents indicated the project was balanced. *Id.*

The court found these representations insufficient to establish indications on which the contractor could justifiably rely. The representations were "more realistically seen as hopes, expectations, guesses, or suggestions than as firm indications that subsurface or latent conditions were such that balance would actually be achieved." *Pacific Alaska Contractors*, 193 Ct.Cl. at 865, 436 F.2d at 470. Viewed in this manner, the contract did not indicate that the project was balanced. *Id.* In accord with *Pacific Alaska Contractors*, the design features cited by plaintiff did not amount to indications on which plaintiff could reasonably rely.

Plaintiff also argues that the soil information included in the contract documents and bidding information indicated that the on-site material was suitable for use as structural fill. First, plaintiff points to the boring logs and specifications. The logs classified the on-site soil as type SM while the specifications indicated SM soil was permissible structural fill. Plaintiff notes that neither the contract documents nor the bidding information contained any express indications that the on-site material failed to meet the gradation requirements. According to plaintiff, the omission of such express indications further indicated that the on-site material was suitable. Taken as a whole, plaintiff assumed this soil information provided convincing indications that the on-site SM soil was suitable for use as structural fill.

Plaintiff's assumption is ill-founded. The specifications did not indicate that any quality of SM soil was suitable for use as structural fill. Technical section 2N, paragraph 2.1.1, indicated that SM soil, as classified by MIL–STD–619, could possibly meet the structural fill requirements. However, the section further required fill material to meet gradation requirements.

These requirements provided that "not more than 80 and 30 percent by weight of the material shall pass the No. 4 sieve and the No. 200 sieve respectively." MIL-STD–619 described SM soil as having at least 12 percent and as much as 50 percent of its particles finer than a No. 200 sieve. Thus, by definition, the on-site SM soil might fail to meet the gradation requirements of section 2N, paragraph 2.1.1. On learning this fact, a prudent contractor would have inquired further. *See Jefferson Constr. Co. v. United States,* 176 Ct. Cl. 1363, 1368–70, 364 F.2d 420, 424 (1966), *cert. denied,* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); *Hunt & Willett, Inc. v. United States,* 168 Ct.Cl. 256, 264–65, 351 F.2d 980, 985 (1964); *Leal v. United States,* 149 Ct.Cl. 451, 462–63, 276 F.2d 378, 384 (1960).

■ Furthermore, plaintiff is responsible for information referenced in the contract documents. Contract general provision I.45 placed the responsibility on the contractor for assessing exploratory work performed by the government. As plaintiff correctly noted, this provision did not require plaintiff to perform its own soil tests. *Kaiser Indus. v. United States,* 169 Ct.Cl. 310, 324, 340 F.2d 322, 330 (1965). Nor did the provision negate the effect of the differing site conditions clause, which allows bidders to rely solely on the information supplied by the government. *Foster Constr.,* 193 Ct.Cl. at 614–16, 435 F.2d at 887–88. The provision, however, did impose on bidders a duty to make simple inquiries into subsurface conditions. *Id.* at 615, 435 F.2d at 888. To fulfill this duty, a bidder must inspect information referenced in the contract documents and made available for inspection. *Stuyvesant Dredging Co.,* 834 F.2d at 1581; *Umpqua River Nav.*

*Co. v. Crescent City Harbor Dist.,* 618 F.2d 588, 594–95 (9th Cir.1980); *Hunt & Willett,* 168 Ct.Cl. at 264–65, 351 F.2d at 985.

Contract section 1D, paragraph 2.1, made such a reference. It informed bidders that "[w]henever subsurface exploration logs are presented in the contract documents, soil test results are available for inspection [at the Corps' office in Baltimore, Maryland]." Among these test results were the sieve analyses and gradation curves. They indicated that the on-site SM soil failed to meet the gradational requirements. Plaintiff is bound by these indications.[8] *Wm. A. Smith Contracting Co. v. United States,* 188 Ct.Cl. 1062, 1087, 412 F.2d 1325, 1339 (1969); *Hunt & Willett,* 168 Ct.Cl. at 265, 351 F.2d at 985–86. Moreover, after foregoing an opportunity to learn the facts, plaintiff cannot prove that it was misled by the contract. *Stuyvesant Dredging Co.,* 834 F.2d at 1582 (citations omitted); *Hunt & Willett,* 168 Ct.Cl. at 265, 351 F.2d at 985–86.

Plaintiff unreasonably failed to fulfill its duty to inspect the referenced soil test results. As these test results revealed the true nature of the subsurface conditions, plaintiff cannot prove a differing site condition. *Stuyvesant Dredging Co.,* 834 F.2d at 1582 (*quoting Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, 857, *aff'd,* 834 F.2d 1576 (Fed.Cir.1987)).

Plaintiff has failed to show that the contract indicated the on-site material was suitable for use as structural fill. Moreover, the conditions actually encountered were reasonably foreseeable based on all the information available at the time of bidding. Accordingly, plaintiff cannot obtain an equitable adjustment for a differing site condition.[9]

---

**8.** In its brief, plaintiff argues that *American Structures, Inc.,* ENG BCA No. 3410, 76–1 BCA ¶ 11,683, held that contractors are not bound by reports made "available" for inspection. *American Structures* can be distinguished from this case based on the respective physical data clauses. Unlike the clause in this case, the *American Structures* clause disclaimed the referenced data and, more importantly, evidenced a strong intent to exclude that data from the contract. Therefore, the *American Structures* holding does

not apply to this case. *See also,* J. Cibinic, Jr., & R. Nash, Jr., *Administration of Government Contracts,* 380–81 (2d ed. 1986) (noting this distinction between the two clauses).

**9.** At oral argument, plaintiff for the first time asserted that the holding in *J.F. Shea Co. v. United States,* 4 Cl.Ct. 46 (1983), precluded summary judgment. However, unlike plaintiff, the contractor in *Shea* had not failed to inspect referenced information that revealed the true

## B. *Superior Knowledge*

Plaintiff claims that defendant breached the contract by its failure to disclose superior knowledge about the site conditions. The government has a duty to disclose superior knowledge when it "possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract." *Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1371–72 (1972). This duty arises only when the information is unavailable elsewhere. *H.N. Bailey & Assoc. v. United States*, 196 Ct. Cl. 166, 178, 449 F.2d 376, 383 (1971); *McCormick Constr. Co. v. United States*, 18 Cl.Ct. 259, 266 (1989), *aff'd mem.*, 907 F.2d 159 (Fed.Cir.1990); *Utility Contractors v. United States*, 8 Cl.Ct. 42, 52 (1985), *aff'd mem.*, 790 F.2d 90 (Fed.Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986).

A "bare withholding" of information is not enough to establish a nondisclosure claim. *Leal*, 149 Ct.Cl. at 460, 276 F.2d at 383. The withholding must have in fact misled the contractor. *Id.* A nondisclosure claim is precluded when "the alleged unknown information would have been obtained through the inquiries contemplated by [the contract] provisions." *Ambrose–Augusterfer Corp. v. United States*, 184 Ct.Cl. 18, 38, 394 F.2d 536, 548 (1968); *Hunt & Willett*, 168 Ct.Cl. at 265, 351 F.2d at 985.

Plaintiff bases its claim in part on defendant's failure to disclose the gradation curves and sieve analyses. Plaintiff again misunderstands the significance of the reference to soil test results in contract section 1D, paragraph 2.1. By making this reference, defendant effectively made available the information embodied in the test results. Thus, plaintiff cannot establish a non-disclosure claim on this basis.

Plaintiff also argues that defendant breached its duty to disclose by withholding the Geotech logs. Consequently, references in these logs to "fill" and "possible fill" were not disclosed to bidders. According-

ing to plaintiff, such references are well known in the construction community to indicate that an area may have served as a dumping ground during earlier construction projects. Plaintiff maintains that this knowledge would have caused it to inquire further into the subsurface conditions.

This argument is of no avail. First, the information contained in the Geotech logs was not "vital to the performance of the contract." Plaintiff, itself, acknowledged that the presence of "fill" or "possible fill" did not preclude using the on-site material as structural fill. In addition, defendant's withholding of the Geotech logs was not misleading. Plaintiff's injury resulted from defendant's rejection of the on-site material for failing to meet the gradation requirements. The Geotech logs contained no indication that the soil failed to meet these requirements.

Plaintiff must bear full responsibility for its failure to inspect the soil test results. Notwithstanding the non-disclosure of the Geotech logs, plaintiff had a duty to investigate the subsurface conditions as far as possible from information supplied by the government. *Hunt & Willett*, 168 Ct.Cl. at 264–65, 351 F.2d at 985. This duty included an obligation to inspect referenced information. *Id.* at 265, 351 F.2d at 985. If plaintiff had fulfilled this obligation, it would have learned that the on-site material was unsuitable for use as structural fill. Therefore, plaintiff cannot claim that it was misled by defendant's nondisclosure. *Ambrose-Augusterfer Corp.*, 184 Ct.Cl. at 38, 394 F.2d at 548. Accordingly, plaintiff's failure to inspect the referenced information precludes its nondisclosure claim. E.g., *Wm. A. Smith*, 188 Ct.Cl. at 1087, 412 F.2d at 1339; *Hunt & Willett*, 168 Ct.Cl at 265, 351 F.2d at 985.

## C. *Misrepresentation*

Plaintiff claims that defendant breached the contract by misrepresenting the site conditions. The government is liable for misrepresentations made in contract documents or bid information and reason-

nature of the subsurface conditions. *Id.* at 50.

*Shea* is thus distinguished from this case.

ably relied on by contractors to their injury. *Edwards v. United States,* 19 Cl.Ct. 663, 670 (1990). However, "a contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid." *Flippin Materials,* 160 Ct.Cl. 357, 367, 312 F.2d 408, 414 (1963). A misrepresentation claim is precluded when an inspection of referenced information would have revealed the truth. *Ambrose–Augusterfer,* 184 Ct.Cl. at 38, 394 F.2d at 548; *Flippin Materials,* 160 Ct.Cl. at 367, 312 F.2d at 414.

 Plaintiff bases its misrepresentation claim on defendant's failure to indicate in the contract documents that the on-site material contained "fill" and "possible fill." This omission is largely immaterial. Plaintiff's damages flowed from defendant's rejection of the on-site material for use as structural fill. Defendant rejected this material because it failed to meet the gradation requirements of contract technical section 2N, paragraph 2.1.1. Defendant did not reject the on-site material because it contained "fill" or "possible fill." Moreover, plaintiff has settled the claims directly related to the presence of fill in the on-site material.

Plaintiff, however, maintains that absent defendant's omission, it would have inquired deeper into the soil conditions and thus discovered that the on-site material failed to meet the gradational requirements. Notwithstanding this argument, plaintiff's failure to inspect the information referenced in the contract precludes its claim. *E.g., Flippin Materials,* 160 Ct.Cl. at 367, 312 F.2d at 414. A contractor cannot rely on a misrepresentation in one part of the contract documents when another part directs it to information that qualifies or negates the misrepresentation. *Id.* at 365, 312 F.2d at 413; *Pleasant Excavating Co. v. United States,* 229 Ct.Cl. 654, 657 (1981). If plaintiff had inspected the soil test results, it would have learned that the on-site material was unsuitable for use as structural fill. Plaintiff's failure to make

this inspection precludes its misrepresentation claim.

*Conclusion*

For the above reasons, defendant's motion for summary judgment is granted. Accordingly, the clerk is directed to dismiss the complaint. No costs.